PHILLIPS LYTLE LLP
ONE CANALSIDE, 125 MAIN STREET
BUFFALO, NEW YORK 14203
Edward S. Bloomberg, Esq.
(716) 847-8400
ebloomberg@phillipslytle.com

DENTONS US LLP
101 JFK PARKWAY, FOURTH FLOOR
SHORT HILLS, NEW JERSEY 07078
Shawn L. Kelly, Esq. (Admitted *Pro Hac Vice*)
Jonathan D. Henry, Esq. (Admitted *Pro Hac Vice*)
(973) 912-7100
shawn.kelly@dentons.com
jonathan.henry@dentons.com

Attorneys for Defendant Providence Washington Insurance Company, as successor in interest by way of merger to Seaton Insurance Company, f/k/a Unigard Security Insurance Company, f/k/a Unigard Mutual Insurance Company (*improperly impleaded as Seaton Insurance Company Individually and as Successor to Unigard Insurance Company*)

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDNA K. MINEWEASER, Executrix of the Estate of PAUL J. MINEWEASER, Deceased, and Individually as Surviving Spouse, etc., <br><br> Plaintiff, <br><br> v. <br><br> ONE BEACON AMERICA INSURANCE COMPANY, et al., <br><br> Defendants. | CIVIL ACTION NO. 14-cv-585 |

**DEFENDANT SEATON INSURANCE COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ....................................................................................................... 3

ARGUMENT ........................................................................................................................ 11

I.      STANDARD OF REVIEW ......................................................................................... 11

II.     THE COURT SHOULD DISMISS PLAINTIFF'S SECTION 3420 CLAIM
        BECAUSE THERE IS NO SEATON POLICY ................................................................ 12

III.    THE COURT SHOULD DISMISS PLAINTIFF'S FRAUDULENT
        CONVEYANCE CLAIM .............................................................................................. 13

        A.      Plaintiff Has No Standing .............................................................................. 14

        B.      Seaton Paid Hedman Fair Value .................................................................... 14

        C.      The Buy-Back Did Not Render Hedman Insolvent ......................................... 15

        D.      There Was No Fraudulent Scheme ................................................................. 16

        E.      There Was No Intent to Defraud .................................................................... 17

        F.      The Rhode Island DBR Approved The Agreement And It Is Entitled To
                Deference .................................................................................................... 18

CONCLUSION ..................................................................................................................... 21

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)................................................................................12

*Atlanta Shipping Corp., Inc. v. Chemical Bank*,
    631 F. Supp. 335 (S.D.N.Y. 1986), *aff'd*, 818 F.2d 240 (2d Cir. 1987) ................................15

*Consolidated Edison Co. of New York, Inc. v. Allstate Ins. Co.*,
    98 N.Y.2d 208 (2002) ................................................................................14

*Eberhard v. Marcu*,
    530 F.3d 122 (2d Cir. 2008)................................................................................14

*In re Greenwald*,
    48 B.R. 263 (S.D.N.Y. 1984)................................................................................18

*Jakubowicz v. A.C. Green Elec. Contractors, Inc.*,
    25 A.D.3d 146 (N.Y. App. Div. 1st Dep't 2005)................................................................................19

*Lippe v. Bairnco Corp.*,
    249 F. Supp. 2d 357 (S.D.N.Y. 2003) *aff'd*, 99 F. App'x 274 (2d Cir. 2004)........................15

*Nat'l Audubon Soc., Inc. v. U.S. Fish & Wildlife Serv.*,
    55 F. Supp. 3d 316 (E.D.N.Y. 2014) ................................................................................18

*Rubin v. Mfrs. Hanover Trust Co.*,
    661 F.2d 979 (2d Cir. 1981)................................................................................14

*In re Sept. 11 Litig.*,
    723 F. Supp. 2d 534 (S.D.N.Y. 2010)................................................................................19

*Sim v. New York Mailers' Union No. 6*,
    166 F.3d 465 (2d Cir.1999)................................................................................12

*Spadaro v. Newark Ins. Co.*,
    21 A.D.2d 226 (N.Y. App. Div. 4th Dep't 1964)................................................................................12

*STV Grp., Inc v. Am. Cont'l Props., Inc.*,
    234 A.D.2d 50 (N.Y. App. Div. 1st Dep't 1996)................................................................................19

*Texas E. Transmission Corp. v. F.E.R.C.*,
    966 F.2d 1506 (D.C. Cir. 1992)................................................................................18

*Weinstock v. Columbia Univ.*,
224 F.3d 33 (2d Cir. 2000)................................................................11, 12

*Wenig v. Glens Falls Ind. Co.*,
294 N.Y. 195 (1945)......................................................................12

*Younger v. Harris*,
401 U.S. 37 (1971)........................................................................18

**Statutes and Rules**

Fed. R. Civ. P. 56................................................................................11

New York Debtor and Creditor Law § 272(b)........................................14

New York Ins. Law § 3420(b) ..........................................................1, 12

R.I. Gen. Laws Ann. § 27-14.1-5.........................................................18

**Other Authorities**

91 N.Y. Jur. 2d Receivers § 112.........................................................19

## PRELIMINARY STATEMENT

Defendant Providence Washington Insurance Company, as successor in interest by way of merger to Seaton Insurance Company, f/k/a Unigard Security Insurance Company, f/k/a Unigard Mutual Insurance Company (*improperly impleaded as Seaton Insurance Company Individually and as Successor to Unigard Insurance Company*) ("Seaton") respectfully submits this memorandum of law in support of its motion for summary judgment.  Seaton also hereby joins in the memoranda and motion papers filed by defendants OneBeacon, Resolute Management, Continental and the London Companies, Harper and Generali, (collectively, "Defendants") in support of their respective motions for summary judgment.  Seaton files this separate brief to emphasize those facts and legal arguments unique to Seaton.

Plaintiff Edna K. Mineweaser ("Plaintiff") has asserted claims against Seaton pursuant to New York Ins. Law § 3420(b) ("Section 3420"), which permits judgment creditors to bring direct actions against insurance companies in very limited circumstances.  Plaintiff has also alleged that an insurance policy "buy-back" agreement, incorporated in a Confidential Settlement Agreement and Mutual Release (the "Agreement"), between Seaton and its putative insured Hedman Resources, Ltd. ("Hedman") constitutes a fraudulent conveyance.  Based upon the undisputed facts, both of these claims must fail as a matter of law.

As to Plaintiff's Section 3420 claim, under New York law a judgment creditor pursuing a claim against an insurer "stands in the shoes" of the putative insured, and cannot assert any rights greater than the insured.  Here, Seaton and Hedman -- which was never a Seaton insured in the first instance -- negotiated a policy-buy back whereby the Seaton Policy was rescinded and Hedman relinquished all of its putative rights as against Seaton.  These actions were taken before the underlying Mineweaser complaint was even filed.  Hedman has no rights under the Seaton

Policy and therefore Plaintiff has no rights under the Seaton Policy. Thus, Plaintiff has no cognizable claim against Seaton under Section 3420, and the court should dismiss this claim.

Plaintiff's fraudulent conveyance claim must likewise fail. Plaintiff's claim against Seaton is premised on the allegation that Hedman received inadequate consideration in exchange for the buy-back. This is simply wrong. Seaton paid Hedman $3,750,000 for the buy-back, which sum dwarfs any potential liability that Seaton might have on Plaintiff's claim. Other facts also militate in favor of dismissal. The Agreement was negotiated by sophisticated parties and counsel at arm's length, taking into account Seaton's significant coverage defenses -- including the inescapable fact that Hedman was not named as an insured under the Seaton Policy. Indeed, even Hedman's President and Chief Executive Officer has admitted, under oath, that the company was represented by able counsel in the hard fought negotiations leading up to the Agreement's execution, and that Hedman desired to enter into the Agreement, in part, due to the viability of Seaton's coverage defenses. Moreover, Seaton and Hedman negotiated and executed the Agreement months before the underlying Mineweaser claim was even filed, and Seaton had no knowledge of the existence of that claim. Finally, the Rhode Island Department of Business Regulation ("DBR") -- which had placed Seaton under Supervision pursuant to Rhode Island law -- approved the Agreement. The court should not allow Plaintiff -- whose claim did not even exist at the time the Agreement was negotiated and finalized -- to disturb the parties' bargained-for finality or call into question the actions of a Rhode Island regulatory agency.

Accordingly, the court should grant Seaton's motion for summary judgment and dismiss Plaintiff's fraudulent conveyance claim with prejudice, as well.

- 2 -

## STATEMENT OF FACTS

### A.     The Seaton Policy

Seaton issued a three-year umbrella liability insurance policy no. 1-0542 (the "Seaton Policy") to Gulf+Western (US) ("G+W") located in New York, New York, effective February 1, 1973, through January 1, 1976.  The Seaton Policy had limits of $20 million per "occurrence" and $20 million in the aggregate for each annual period, where applicable, above underlying $1 million Travelers primary policies.  (Seaton's Statement of Undisputed Material Facts ("SUMF"), ¶ 1).  Hedman, a Canadian entity, alleged that it was an indirect subsidiary or affiliate of G+W during the Seaton Policy's effective period, although Seaton never received proof sufficient to establish that relationship.    (*Id.*).

For several decades, Hedman allegedly mined and processed asbestos-containing material in Canada and manufactured goods that contained asbestos.  Consequently, individuals have allegedly been exposed to asbestos in Hedman's manufactured materials, thereby subjecting Hedman to potential liability for injuries caused by the inhalation of asbestos fibers.  (*Id.* at ¶ 2).  For many years, the Travelers primary policies underlying the Seaton Policy responded to the asbestos-related claims brought against Hedman.  Travelers paid defense costs and also funded settlements and judgments.  In February 2012, Travelers advised that it had committed all remaining available policy limits for Hedman-related indemnity payments, and that upon payment of those committed limits, Travelers would have no further duty to defend or indemnify Hedman.  To Seaton's knowledge, Travelers has never obtained a judicial declaration that it has fully satisfied its coverage obligations to Hedman.  (*Id.* at ¶ 3).

### B.     The Failing Case

In or around June 2011, Travelers advised that its primary policies (effective from December 31, 1966 to January 1, 1980) underlying the Seaton Policy and an excess policy

(effective from January 1, 1979 to January 1, 1980) were either approaching exhaustion or had already been exhausted.  As a result, in or around November 2011, Hedman demanded that Seaton participate in the settlement of an asbestos bodily injury claim brought by Gerald Failing in the Supreme Court of New York, Niagara County, against Hedman and other parties.  Trial was scheduled to begin in the Failing matter on November 28, 2011.  (*Id.* at ¶ 4).

Seaton immediately undertook an investigation of the claim, which revealed several fundamental problems with Hedman's demand for coverage.  For instance, Seaton never issued a policy of insurance to Hedman, and there was strong evidence that Hedman was not -- and was never intended to be -- an insured under the Seaton Policy that was issued to G+W.  If Hedman was not an insured under the Seaton Policy, then there could be no coverage for the Failing claim or for any other asbestos claim brought against Hedman.  Furthermore, it appeared that the underlying primary policies had not been properly exhausted in that significant limits remained available under one or more primary policies that had been issued to Hedman in Canada.  Seaton also discovered numerous other potential defenses to coverage, including Hedman's failure to provide timely and proper notice of the claims to Seaton, the improper aggregation of certain of the underlying claims and the improper allocation of those claims across the Hedman coverage period.  (*Id.* at ¶ 5).

The situation was urgent, as there was very little time to make a proper coverage determination in light of the impending trial date.  Seaton was therefore limited in its ability to fully investigate the Failing claim and all of its potential coverage defenses.  Accordingly, Seaton reserved its rights, but nevertheless agreed to settle the Failing claim for $227,848.10 in order to protect the interests of Hedman, the putative insured.  This settlement, which was confirmed during a telephone conference with Judge John Lane while the Failing jury was in deliberations,

extinguished all present and future obligations to the Failings pursuant to the Seaton Policy.  (*Id.* at ¶ 6).

## C.      The Use of Policy Buy-Backs

Seaton never again wanted to be placed in the same situation as it confronted in Failing -- having to make a rushed coverage determination on a significant claim in the face of an ongoing trial.  (*Id.* at ¶ 7).

In addition, Seaton had its own financial issues to consider.  In 2008, due to its declining financial condition, Seaton had been placed under the Supervision of the DBR.  As of 2011, Seaton's financial situation was precarious -- the company was in "runoff."  In other words, Seaton was no longer actively writing business or collecting premiums, but rather, was managing its existing policies under the supervision of the DBR.  The goal of Seaton -- and of the DBR -- was to efficiently wind down the company and pay legitimate claims from Seaton's remaining resources.  (*Id.* at ¶ 8).

Thus, instead of having Seaton consider claims on an individual basis -- like the Failing claim -- Seaton began negotiating a policy "buy-back" with Hedman to resolve all potential claims, including all asbestos claims, on a global basis.  Hedman's counsel confirmed that it was receptive to such an approach.  Indeed, Hedman's counsel had consummated prior buy-back settlements with Seaton and was known to embrace such settlements.  (*Id.* at ¶ 9).

An insurance policy "buy-back" is a mutual agreement whereby an insurance company pays the insured (or alleged insured) a lump sum of money in exchange for the complete release of all past, present, and future liabilities under the subject policy.  In effect, the insurance coverage is "bought back" or rescinded -- as if the insurance policy was never issued.  There are

benefits to both the policyholder and the insurance company through policy "buy-backs," which are common practices utilized by runoff insurance companies, such as Seaton.  (*Id.* at ¶ 10).

The policyholder benefits from a policy buy-back because it receives an immediate cash payment that can be used to pay defense and indemnity obligations to asbestos claimants. Policyholders acquire the funding to defend, settle and litigate asbestos claims as they desire, without any interference from the insurance carriers.  In addition, in light of the precarious financial condition of many insurance companies -- including Seaton -- policyholders are assured a present payment rather than the prospects of a potentially insolvent insurer in the future.  In sum, policy "buy-backs" bring financial certainty to what are often inherently uncertain situations, and they serve to direct an insurer's remaining funds toward settlements with claimants, as opposed to toward costly and protracted litigation to resolve numerous complex coverage issues.  (*Id.* at ¶ 11).

Hedman in particular found the possibility of a buy-back attractive for a variety of reasons.  Among other things, Hedman believed, based on the advice of counsel, that suing Seaton for declaratory relief would be "risky, time consuming, [and] very expensive."  (*Id.* at ¶ 12).    Moreover, Hedman was aware that "there were gaps in the documentation creating insufficient legal certainty to establish a clear coverage obligation" on behalf of Seaton.  (*Id.*).  In other words, Hedman fully understood that litigating the issue of coverage would involve a significant expenditure of time and money, and would quite possibly result in a ruling adverse to the company.  (*Id.*).

Likewise, policy buy-backs are also attractive to insurance companies under certain circumstances.  Instead of having to confront long-tail liabilities -- which, in the case of asbestos, may take decades to close -- an insurance company can extinguish these claims from its books

through an expedited lump-sum payment.  In that manner, the run-off insurance company, like Seaton, can efficiently accelerate and crystalize its liabilities and close down its affairs in an orderly manner.  And the immediate cash payment insures that funds will be available for asbestos claimants -- regardless of the ultimate financial condition of the insurance company or the existence of coverage defenses that might operate as a bar to coverage.  (*Id.* at ¶ 13).

For all of these reasons, policy "buy-backs" serve a useful function and are common in this industry.  "Buy-backs" are particularly effective in dealing with "long-tail" liabilities -- like Hedman's asbestos claims -- by an insurance company with financial concerns -- like Seaton.  (*Id.* at ¶ 14).

## D.     The Hedman/Seaton Buy-Back

For the reasons previously discussed, Hedman and Seaton both supported a resolution of their coverage dispute through a policy buy-back.  (*Id.* at ¶ 15).  During the buy-back negotiation, Hedman was represented by highly competent counsel -- Scott Gilbert, Esq. of Gilbert LLP, and his partner, Richard Shore, Esq.  Scott Gilbert is a well-known policyholder's counsel, and is well-versed in all aspects of insurance law and, in particular, in asbestos law.  Indeed, in September 2004, Fortune Magazine referred to Mr. Gilbert as "hands down, the nation's premier attorney for asbestos defendants seeking reimbursement from reluctant insurance carriers."  (*Id.* at ¶ 16).  Moreover, Hedman's President and Chief Executive Officer, Steven Edell, recently described Mr. Gilbert as a "nationally known lawyer" who was "highly knowledgeable and professional and well-versed in this area of business and law." Mr.  Edell further indicated that Hedman was "incredibly fortunate that a lawyer of the caliber of Scott Gilbert was willing" to represent it in connection with the buy-back negotiations. (*Id.* at ¶¶ 12, 16).  Mr. Shore is

likewise a very experienced lawyer who has a well-deserved reputation as a very sophisticated negotiator. (*Id.* at ¶ 17).

Joseph P. Follis negotiated the policy buy-back on behalf of Seaton. Mr. Follis has been involved with at least 50 policy buy-backs, and has personally negotiated several policy buy-backs with Mr. Gilbert and his firm wherein he represented other Seaton policyholders. Mr. Follis negotiated the Agreement directly with Mr. Gilbert and Mr. Shore. (*Id.*).

Seaton and Hedman agree that negotiation of the Agreement was both difficult and contentious. (*Id.* at ¶ 18). There were serious disputes between the parties, including the following:

   (a)    Was Hedman even covered under the Seaton Policy?

   (b)    Had the Travelers primary policies and other primary policies, including Travelers' Canadian policies, been properly exhausted?

   (c)    Had Hedman complied with the Seaton Policy's notice provisions as well as all other policy conditions precedent to coverage?

   (d)    Had the claims payments made by Travelers been properly allocated to the appropriate policy years and policies?

   (e)    Were the underlying claims properly aggregated? Should some of the claims have been defended and settled within the underlying policies' per occurrence limits?

   (f)    Did all of the underlying claims fall within the underlying policies' grant of coverage? For instance, did the claimants present medically acceptable evidence of an asbestos-related injury that had been caused by Hedman's asbestos?

   (g)    Did the underlying claims arise from events that may have been expected or intended, or the result of intentional or willful acts, or the consequences of ordinary, repetitive, and intended business practices?

(*Id.*).

Additionally, there were significant issues as to how Hedman's asbestos losses should be allocated across all of its policies. Allocation law is extremely complex, but New York generally applies a pro-rata allocation across policy years where there is available insurance coverage. The Seaton Policy only provided coverage for a three-year period, so the vast majority of Hedman's asbestos losses, which typically involved injuries that spanned decades, were not allocated to the Seaton Policy. All of these issues were the subject of the negotiation, which was conducted at arm's-length and in good faith. (*Id.* at ¶ 19).

After several months of negotiations, Hedman and Seaton finally reached a settlement, and Seaton paid to Hedman $3,750,000. Seaton's understanding was that Hedman intended to use this money to defend, settle, or otherwise resolve any asbestos claims that might arise in the future. This sum represented a substantial payment by Seaton. Using the Failing $227,848 settlement as a guidepost, Seaton paid sufficient funds to settle sixteen (16) asbestos claims of equal value. Furthermore, the Failing settlement was at the upper end of the valuation spectrum, and typical asbestos claims resolve for only a fraction of such an amount. Seaton's clear understanding was that the payment of this sum "bought back" the Seaton Policy, thereby extinguishing all of Seaton's liability to Hedman, and that Seaton could never be potentially liable for another Hedman asbestos claim, including the defense thereof. (*Id.* at ¶ 20).

Those expectations are reflected in the language of the Agreement by which Hedman granted a full release to Seaton, as follows:

> Effective automatically upon the Effective Date, and without further action by any Person, **Hedman hereby fully, finally, and forever releases the Seaton Releasees with respect to any and all Claims Hedman has or may have against the Seaton Releasees concerning the Policy** (including such Claims for or with respect to breach of contract, consequential damages, punitive damages, exemplary damages, prejudgment interest, post-judgment interest, penalty interest, extracontractual damages or remedies,

unfair or deceptive trade practices, improper defense or settlement practices, violations of an insurance or other statutory code provisions, bad faith, breach of fiduciary duty, fraud, malice, or oppression arising out of such claims, sanctions, and attorneys' fees). Under the terms of Section IV.B, it is Hedman's intention to reserve no rights or benefits whatsoever as against Seaton under or in connection with the Policy. **Upon the Effective Date, any and all rights, duties, responsibilities, and obligations of Seaton to Hedman created by or in connection with the Policy are terminated. From and after the Effective Date, Seaton owes Hedman no insurance coverage under the Policy.**

(*Id.* at ¶ 21 (emphasis added)).

Since the Seaton Policy was "bought back," Seaton no longer had any obligations to Hedman. Seaton was still under Supervision, and Seaton was required to -- and did -- seek the approval of the DBR before entering into the Agreement. The DBR approved the Agreement and authorized Seaton to pay $3,750,000 pursuant thereto. Seaton would never have recommended to the DBR this payment to Hedman -- and, presumably, the DBR would never have agreed -- in the absence of a full and final "buy-back" of the Seaton Policy. (*Id.* at ¶ 22).

Upon the approval of the DBR, the execution of the Agreement in March 2012, and the payment of the above settlement proceeds, Seaton believed that it had completely resolved its involvement with all existing and potential Hedman asbestos claims. At that point, Seaton advised the other Hedman carriers that it had resolved all issues with Hedman and requested that its defense counsel cease tendering new complaints to Seaton. (*Id.* at ¶ 23).

**E.     The Mineweaser Claim**

Unbeknownst to Seaton, Plaintiff filed a Complaint against Hedman in November 2012. Plaintiff's claim allegedly arose from her husband's exposure to Hedman's asbestos during the course of his employment at Durez Plastics, a division of Occidental Chemical Corporation, at a

plant located in North Tonawanda, New York. According to the Complaint, Hedman allegedly sold raw asbestos fiber to Durez Plastics. (*Id.* at ¶ 24).

As noted, Plaintiff filed her claim against Hedman and other entities in November 2012. Seaton had begun negotiating the Agreement with Hedman one year before that, and the Agreement became effective in March 2012 -- eight months before the Complaint was filed. Seaton had no knowledge of the Mineweaser claim at the time it negotiated the Agreement. In fact, Seaton believed that its liability for all of Hedman's asbestos claims had been extinguished by the policy "buy-back," and therefore the Mineweaser claim had no impact on Seaton. (*Id.* at ¶ 25).

Plaintiff allegedly acquired a $3,000,000 default judgment against Hedman, and now seeks to recover on that judgment against Seaton and other insurers pursuant to New York's direct action statute. Plaintiff also seeks to avoid the Agreement as a fraudulent conveyance. (*Id.* at ¶ 26).

Seaton now moves for summary judgment dismissing Plaintiff's Complaint, with prejudice, pursuant to Rule 56.

## ARGUMENT

### I.    STANDARD OF REVIEW

Pursuant to Rule 56, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Although "the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000), *superseded by statute on other grounds*, (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). "[U]nsupported allegations do not create a material

issue of fact." *Id.* Similarly, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to survive a motion for summary judgment; rather, "there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Accordingly, summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Sim v. New York Mailers' Union No. 6*, 166 F.3d 465, 469 (2d Cir.1999) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## II.    THE COURT SHOULD DISMISS PLAINTIFF'S SECTION 3420 CLAIM BECAUSE THERE IS NO SEATON POLICY

Plaintiff has no claim against Seaton under Section 3420.  Section 3420 provides a very limited right to certain judgment creditors to proceed with a "direct action" against the purported insured's carrier.  The statute states in relevant part:

> (b) Subject to the limitations and conditions of paragraph two of subsection (a) of this section, an action may be maintained by the following persons against the insurer **upon any policy or contract of liability insurance** that is governed by such paragraph, to recover the amount of a judgment against the insured or his personal representative:
>
> (1) any person who, or the personal representative of any person who, has obtained a judgment against the insured or the insured's personal representative, for damages for injury sustained or loss or damage occasioned **during the life of the policy or contract**.

New York Ins. Law § 3420(b) (emphasis added).

The New York courts have recognized for at least seven decades that a judgment creditor pursuing a claim under Section 3420 merely "stands in the shoes" of the putative insured.  *Wenig v. Glens Falls Ind. Co.*, 294 N.Y. 195, 198 (1945).  In other words, the judgment creditor cannot "recover against the liability insurer unless the insured could have recovered."  *Spadaro v.*

*Newark Ins. Co.*, 21 A.D.2d. 226, 230 (N.Y. App. Div. 4th Dep't 1964). This holding dooms Plaintiff's Section 3420 claim in this case because the putative insured Hedman has no rights as against Seaton. Indeed, there is no longer any "policy or contract of liability insurance" upon which Hedman -- or Plaintiff -- may recover.

Here, Hedman voluntarily relinquished all of its purported rights under the Seaton Policy in exchange for good and valuable consideration -- $3,750,000 -- when it entered into the Agreement. The Agreement bought back the Seaton Policy, and extinguished all of Hedman's putative rights. As reflected in the Agreement at paragraph IV.B, "**Seaton owes Hedman no insurance coverage under the Policy**," Hedman released Seaton with respect to any claims it had or may have had concerning the Seaton Policy, and Hedman reserved no rights or benefits "whatsoever" as against Seaton in connection with the Seaton Policy. (*See* SUMF at ¶ 21 (emphasis added)). Furthermore, the Agreement "terminated" "any and all rights, duties, responsibilities, and obligations of Seaton to Hedman created by or in connection with the Policy." (*Id.*). Thus, Hedman has no rights under the Seaton Policy, and so Plaintiff does not possess a cognizable claim under Section 3420. There simply is no "policy or contract of liability insurance" for Hedman or Plaintiff to sue on. Therefore, Seaton is entitled to summary judgment and the court should dismiss Plaintiff's Section 3420 claim with prejudice.

## III.    THE COURT SHOULD DISMISS PLAINTIFF'S FRAUDULENT CONVEYANCE CLAIM

The court should also dismiss Plaintiff's fraudulent conveyance claim with prejudice. Plaintiff's allegations assert myriad facts in search of a legally cognizable cause of action -- but a fraudulent conveyance claim is not a possible result. For multiple reasons, as discussed below, the Agreement was not a fraudulent conveyance and this court should so find as matter of law.

### A.      Plaintiff Has No Standing

First, Plaintiff has no standing to challenge the conveyance as fraudulent.  *See Eberhard v. Marcu*, 530 F.3d 122, 129 (2d Cir. 2008) (holding that "those who are not injured by the transfer lack standing to challenge it").  Plaintiff is a stranger to the Seaton Policy and is not a party to the Agreement.  Notably, Plaintiff had not even asserted a claim at the time the Agreement was negotiated and executed.  Plaintiff's only possible standing to sue Seaton arises from Section 3420, which provides a very narrow set of circumstances -- in fact, the entire universe of claims that a judgment creditor may bring against an insurer -- upon which a judgment creditor may sue an insurance company directly.  As previously discussed, however, Plaintiff cannot proceed with her Section 3420 claim.  The only possible standing is as a claimant pursuant to Hedman's insurance -- but those policies, including the Seaton Policy, have all been bought back and are no longer in existence.  Thus, her fraudulent conveyance claim must necessarily fail as well.

### B.      Seaton Paid Hedman Fair Value

Second, Seaton paid Hedman fair value for the policy buy-back.  Fair value is present if there is an exchange of an "amount not disproportionately small as compared with the value of the property."  *Rubin v. Mfrs. Hanover Trust Co.*, 661 F.2d 979, 993 (2d Cir. 1981) (defining fair consideration in bankruptcy context); *see also* New York Debtor and Creditor Law § 272(b) (defining fair consideration under New York law in fraudulent conveyance context).  Here, Seaton paid Hedman $3,750,000 for the policy buy-back.  Using the Failing settlement of $227,848 as a guidepost (and this settlement is on the high range for asbestos settlements), Seaton paid sufficient funds to Hedman to settle at least sixteen (16) asbestos claims of equal value.  (*See* SUMF at ¶ 20).  Given that asbestos claims often settle for only a fraction of that amount, Seaton conceivably funded hundreds of future asbestos claim settlements.

In fact, Seaton paid Hedman many times its proportionate share of the Mineweaser claim under New York's pro rata allocation regime. *See Consolidated Edison Co. of New York, Inc. v. Allstate Ins. Co.*, 98 N.Y.2d 208, 224 (2002). Here, Plaintiff seeks coverage over eighteen policy years for a $3,000,000 judgment, equating to a share of $166,667 per policy year. Seaton's coverage is implicated in slightly less than three of those years, equating to a share of $486,080.[1] Thus, Seaton's maximum potential liability for the Mineweaser claim is $486,080. Seaton paid Hedman nearly eight (8) times this amount -- $3,750,000 -- in connection with the policy buy-back. (*See* SUMF at ¶ 20).

The only issue presented here is whether Seaton's settlement payment was a fraudulent conveyance with respect to this plaintiff. Since Seaton's payment is sufficient to pay the entirety of Plaintiff's claim -- in fact, Seaton alone paid $750,000 in excess of the claim -- Plaintiff's assertion that the consideration was inadequate and the conveyance was fraudulent cannot be established as a matter of law. *See Atlanta Shipping Corp., Inc. v. Chemical Bank*, 631 F. Supp. 335, 346 (S.D.N.Y. 1986), *aff'd*, 818 F.2d 240 (2d Cir. 1987) (holding that "[f]raudulent intent will not be presumed, unless fair consideration is lacking" under New York law). The bottom line here is that Seaton paid Hedman $3,750,000, which is $750,000 more than Plaintiff's claim. That payment was fair value and Plaintiff simply cannot establish this crucial predicate.

### C.    The Buy-Back Did Not Render Hedman Insolvent

Third, there is no basis for Plaintiff to contend that the buy-back rendered Hedman insolvent -- in fact, just the opposite is true. *See Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 376 (S.D.N.Y. 2003) *aff'd*, 99 F. App'x 274 (2d Cir. 2004) (holding that New York Debtor and Creditor law requires that the subject transfer must "deplete or otherwise diminish the value of the assets of the debtor's estate" for the transfer to be considered a fraudulent conveyance). The

---

[1] The Seaton Policies were effective from February 1, 1973 to January 1, 1976 -- i.e., 35 months. (SUMF at ¶ 1).

Agreement did not deplete Hedman's assets -- just the opposite occurred.  Regardless of its prior financial condition, Hedman now had an additional $3,750,000 to pay the Mineweaser claim. Seaton paid Hedman sufficient resources to fund the settlement of asbestos claims for years to come.  (SUMF at ¶ 20).

Notably, Hedman itself has acknowledged that the Agreement was a financial boon for the company.  Rather than undertaking the "risky, time consuming, [and] very expensive" step of litigating coverage with Seaton -- a step which Hedman knew may result in an adverse outcome for the company -- Hedman instead entered into the Agreement based on its counsel's "expert legal advice and Hedman's belief that [the Agreement was] commercially reasonable and lawful."  (SUMF at ¶¶ 12, 19).

In essence, Seaton unquestionably contributed to Hedman's solvency; the Agreement did not render Hedman insolvent.

### D.    There Was No Fraudulent Scheme

Fourth, the Agreement was not the result of any fraudulent scheme between Seaton and Hedman.  Seaton and Hedman acted in good faith when they negotiated the Agreement -- a fact confirmed by both parties to the transaction.  Seaton acted to protect Hedman's interests when it settled the Failing case.  Shortly thereafter, the parties negotiated the Agreement over several months at arm's length, long before the Mineweaser claim was filed.  Both parties acknowledge that the negotiations were hard fought, and both parties agree that Hedman was represented by experienced and respected policyholders' counsel throughout the process.  The negotiations took into account Seaton's substantial coverage defenses, including, most significantly, the fact that Seaton never issued a policy to Hedman. (*See id.* at ¶¶ 16-20).

### E.     There Was No Intent to Defraud

Fifth, Seaton did not intend to defraud any of Hedman's claimants when Hedman and Seaton entered into the Agreement.  As explained above, policy buy-backs are commonly used in the insurance industry for many reasons:  (i) the policyholder receives an immediate cash payment and need not worry about an insurer's potential insolvency in the future; (ii) the policyholder retains complete control over the defense and settlement of claims; (iii) policy buy-backs direct funds towards claims settlement, rather than protracted litigation over coverage disputes; (iv) policy buy-backs allow insurers to extinguish liabilities that may stretch into the future for decades; and (v) policy buy-backs crystallize and accelerate liabilities, thereby bringing clarity to an insurer, like Seaton, that is in run-off and in the process of closing down its affairs in an orderly manner.  (*Id.* at ¶¶ 10-15).  All of these factors came into play in the negotiations between Seaton and Hedman, and none of these factors indicate or evidence any intent to defraud Hedman's claimants.  Moreover, Seaton specifically understood that Hedman would use the funds it received pursuant to the Agreement to defend, settle, or otherwise resolve asbestos claims that might be brought against it in the future.  (*Id.* at ¶ 20).

In fact, not only was there no intent to defraud, but Seaton acted in the best interests of its putative policyholder -- Hedman.  Seaton could have refused to settle the coverage dispute against Hedman -- just as it could have refused to settle the Failing case -- and could have chosen a course to litigate all coverage issues.  The result would have been the very result Hedman sought to avoid by entering into the Agreement -- years of litigation and delay with the potential for no recovery of insurance funds.  (*See id.* at ¶ 12).  Instead, Seaton settled its coverage obligations, bought back its Policy and paid Hedman more than sufficient funds to pay Plaintiff in full.  Under these undisputed facts, Plaintiff cannot possibly establish an intent to defraud.

**F.      The Rhode Island DBR Approved The Agreement And It Is Entitled To Deference**

Sixth, as noted above, the DBR placed Seaton under Supervision beginning in May 2008. (*Id.* at ¶ 8).  As reflected in the Order Creating State of Supervision and Appointment of Supervisor and the Orders Extending State of Supervision, (collectively, the "Supervision Order"), the DBR -- through the Rhode Island Superintendent of Insurance -- made a determination that the continuation of Seaton's business is "hazardous to the public or to holders of its policies," based primarily on the fact that Seaton's dwindling policyholder reserves would leave it unable to pay claims on Seaton policies.  (*Id.* at ¶ 8; Supervision Order, annexed to the Declaration of Shawn L. Kelly ("Kelly Decl.") as Exhibits B and C.)  Accordingly, pursuant to Rhode Island law and the Supervision Order, Seaton was required to seek the Supervisor's approval before, inter alia, conveying any assets, transferring any property or entering into any policy buy-back agreements.  *See* R.I. Gen. Laws Ann. § 27-14.1-5 (listing acts that an insurer may not do during a period of supervision absent the approval of the supervisor); Supervision Order, annexed to the Kelly Decl. as Exs. B and C, p.2 (incorporating and supplementing that list).

Pursuant to those statutory guidelines, Seaton sought and received the Supervisor's permission to enter into the Agreement.  (SUMF at ¶ 22).  This approval -- an administrative action by Rhode Island's insurance regulatory agency -- is entitled to deference based upon both principles of comity and administrative law principles.  *See Younger v. Harris*, 401 U.S. 37, 44 (1971) (holding that "comity" concerns the "proper respect for state functions" and that States should be "left free to perform their separate functions in their separate ways"); *Nat'l Audubon Soc., Inc. v. U.S. Fish & Wildlife Serv.*, 55 F. Supp. 3d 316, 350 (E.D.N.Y. 2014) (review of agency decisions is "highly deferential"); *In re Greenwald*, 48 B.R. 263, 274 (S.D.N.Y. 1984)

(holding that "a deferential standard governs the court's review of the actions of state agencies and their officials and **a presumption of validity attaches to the action of administrative agencies**" (emphasis added)); *see also Texas E. Transmission Corp. v. F.E.R.C.*, 966 F.2d 1506, 1509 (D.C. Cir. 1992) (holding that "where an agency has approved an agreement between private parties . . . that agreement is closely akin to an order" by the agency, which is entitled to deference); 91 N.Y. Jur. 2d Receivers § 112 ("The general rule, followed in New York, is that the courts will not take jurisdiction of the internal affairs of a foreign corporation").  This court should not allow Plaintiff to wage an unauthorized collateral attack on the valid administrative actions taken by a regulatory body of a sister state.  The DBR's action is entitled to great deference, and neither Rhode Island nor New York law permit Plaintiff to attack the DBR's decision.

Finally, the New York public policy favoring settlement strongly favors the dismissal of Plaintiff's fraudulent conveyance claim.  *See Jakubowicz v. A.C. Green Elec. Contractors, Inc.*, 25 A.D.3d 146, 152 (N.Y. App. Div. 1st Dep't 2005) (holding that "settlement is favored as a means of facilitating the resolution of disputes and preserving judicial resources").  Should this court decide to allow Plaintiff's claims to proceed, that decision will have significant implications for insurance companies contemplating settlement with their insureds and putative insureds.  Insurance companies -- and indeed, any company contemplating settlement -- will be much more reluctant to settle claims if those settlements can later be unwound or challenged in court as fraudulent by later claimants.  This is not what the public policy of this State prefers.  New York prefers the swift and final settlement of claims.  Indeed, New York even allows and encourages settlement when there is a possibility that later claimants may be left with no means of collecting on their claims.  *In re Sept. 11 Litig.*, 723 F. Supp. 2d 534, 542 (S.D.N.Y. 2010);

*STV Grp., Inc v. Am. Cont'l Props., Inc.*, 234 A.D.2d 50, 51 (N.Y. App. Div. 1st Dep't 1996). Thus, Seaton is entitled to summary judgment and the court should dismiss Plaintiff's fraudulent conveyance claim.

* * * *

Try as it may, Plaintiff simply cannot concoct a fraudulent conveyance cause of action upon the undisputed facts presented here. Not only does Plaintiff not have standing, but Seaton's payment was for fair value and it actually increased Hedman's solvency. Finally, the settlement was approved by a governmental agency, which is entitled to great deference. The Agreement was not a fraudulent conveyance, and this Court should grant summary judgment in Seaton's favor as a matter of law.

## <u>CONCLUSION</u>

For the reasons set forth herein and in Seaton's supporting papers -- and Defendants' moving papers -- the Court should grant Seaton's motion for summary judgment and dismiss Plaintiff's Complaint with prejudice.

PHILLIPS LYTLE LLP

BY:  **<u>/S/ EDWARD S. BLOOMBERG</u>**
      EDWARD S. BLOOMBERG


DENTONS US LLP

BY:  **<u>/S/ SHAWN L. KELLY</u>**
      SHAWN L. KELLY


Attorneys for Defendant Providence
Washington Insurance Company, as
successor in interest by way of merger to
Seaton Insurance Company, f/k/a Unigard
Security Insurance Company, f/k/a Unigard
Mutual Insurance Company (*improperly
impleaded as Seaton Insurance Company
Individually and as Successor to Unigard
Insurance Company*)


Date:  July 27, 2015

83711894