# UNITED STATES DISTRICT COURT

### for the

### Western District of New York

| | | |
|---|---|---|
| EDNA K. MINEWEASER, Executrix of the Estate of PAUL J. MINEWEASER, Deceased, | ) ) ) | Civil Action No.:14- cv-585 |
| *Plaintiff* | ) ) | |
| v. | ) ) | |
| ONE BEACON AMERICA INSURANCE COMPANY, et al. | ) ) ) | |
| *Defendants* | ) | |

## MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS LAMORAK INSURANCE COMPANY, f/k/a ONEBEACON AMERICA INSURANCE COMPANY, RESOLUTE MANAGEMENT INC, AS ADMINISTRATOR FOR LAMORAK INSURANCE COMPANY, AND CONTINENTAL INSURANCE COMPANY, INDIVIDUALLY AND AS SUCCESSOR TO CERTAIN LIABILITIES OF HARBOR INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

Eileen T. McCabe
Jaimie H. Ginzberg
Joseph J. Schwartz
**MENDES & MOUNT, LLP**
750 Seventh Ave.
New York, NY 10019-6829
Tel: 212.261.8254
Fax: 212.261.8750

*Attorneys for Defendants Lamorak Insurance Company, f/k/a OneBeacon America Insurance Company, Resolute Management Inc., as Administrator for One Beacon America Insurance Company, and Continental Insurance Company, Individually and as Successor to Certain Liabilities of Harbor Insurance Company.*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................... 1

COUNTERSTATMENT OF FACTS............................................................................. 4

ARGUMENT ................................................................................................................ 7

I. PLAINTIFF SEEKS RELIEF BEYOND THE SCOPE AFFORDED
   UNDER NEW YORK INSURANCE LAW §3420 ............................................... 7

   A. §3420(a)(1) Does Not Require The Settlement Agreements to Be Voided ........ 8

   B. §3420 Does Not Render The Settlement Agreements Unenforceable ................ 10

II. PLAINTIFF FAILS TO ESTABLISH HEDMAN'S RIGHTS TO COVERAGE
    AS A MATTER OF LAW AND FACT.................................................................... 13

   A. The Coverage Dispute between Hedman and the Insurers was Longstanding
      and Well Known to Plaintiff's Counsel, Lipsitz & Ponterio, LLC. ................. 14

   B. Questions of Fact Exist As To Whether Hedman Is A Named Assured
      Under The Gulf & Western Policies................................................................. 15

   C. Questions of Fact Exist as to Whether the Policies are Triggered Under
      New York Law…. ........................................................................................... 17

      i. Under New York Law, Plaintiff Must Prove Injury During The Policy Period ....... 18

      ii. Questions of Fact Exist as to Whether Plaintiff Can Establish Injury In
          Fact During A Policy Period..................................................................... 20

   D. §3420 Has No Bearing on the Pro Rata, Time on the Risk Allocation .............. 21

      i. Lamorak and Continental's Respective Pro Rata Shares Of The Mineweaser
         Judgment Is Well Below $3 Million.......................................................... 24

   E. Additional Coverage Defenses Exist Precluding Coverage To Hedman ........... 25

   F. The Insurers Are Not Estoped From Raising Coverage Defenses..................... 27

III. PLAINTIFF'S FRAUDULENT CONVEYANCE CAUSE OF ACTION FAILS
     AS A MATTER OF LAW AND FACT ................................................................ 29

A.  Plaintiff Fails To Rebut The Argument That She Has No Standing To Assert A Fraudulent Conveyance Cause Of Action ........................................................ 29

B.  Plaintiff Cannot Satisfy Essential Elements of Fraudulent Conveyance Claim ............ 29

i. Hedman Was Not Rendered Insolvent By Virtue Of The Settlement Agreements ..... 30

ii. The Mineweaser Judgment Was Not A Debt Antecedent To The Transfers .............. 31

iii. The Settlement Agreements Were Entered In Good Faith ........................................... 31

iv. The Settlement Agreements Were Made For Fair Consideration .............................. 34

C.  Plaintiffs Failed To Plead A Cause Of Action Under NYDCL §276 ............................. 36

D.  Plaintiff Is Not Entitled To Summary Judgment Against Continental Pursuant To New York Debtor Creditor Law §273-a .................................................................. 39

CONCLUSION ........................................................................................................................... 41

## TABLE OF AUTHORITIES

**Cases**

*A.F.L. Falck, S.p.A. v. E.A. Karay Co.*,
    722 F. Supp. 12 (S.D.N.Y. 1989) .................................................................. 40

*American Home Products Corp. v. Liberty Mutual Ins. Co.*,
    748 F.2d 760 (2d. Cir. 1984) ...................................................................... 19

*Arida v. Essex Ins. Co.*,
    299 A.D.2d 902 (4th Dep't. 2002) ............................................................. 12

*Berner Trucking Inc. v. Brown*,
    281 A.D.2d 924 (1st Dep't 2001)................................................................ 40

*Borg-Warner Corp. v. Insurance Co. of North America*,
    174 A.D.2d 24 (3rd Dep't 1992) ................................................................. 14

*Bucki v. Singleton (In re Cardon Realty Corp.)*,
    146 B.R. 72 (Bankr. Ct. W.D.N.Y. 1992)................................................... 33

*Chrysler Capital Corp. v. Century Power Corp.*,
    778 F. Supp. 1260 (S.D.N.Y. 1991)........................................................... 40

*Conseco, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
    2002 WL 31961447 (Ind. Cir. 2002).......................................................... 29

*Consolidated Edison Co. v. Allstate Ins. Co.*,
    98 N.Y.2d 208 (2002) ("*Con Ed*") .................................................... passim

*Consorti v. Owens-Corning Fiber Glass Corp.*,
    86 N.Y.2d 449 (1995) ................................................................................ 21

*Cont'l Cas. Co v. Rapid American Corp.*,
    80 N.Y.2d 640 (N.Y. 1993)................................................................... 18, 19

*Continental Cas. Co. v. Employers Ins. Co. at Wausau*,
    60 A.D.3d 128 (1st Dep't 2008)......................................................... passim

*Denburg v. Parker Chapin Flattau & Klimpl*,
    82 N.Y.2d 375 (1993) ................................................................................ 11

*Dresser Indus., Inc. v. Underwriters at Lloyd's, London*,
106 S.W.3d 767 (Tex. App. 2003) ........................................................................... 29

*Eclaire Advisor Ltd. v. Daiwoo Eng'g & Constr.*,
375 F.Supp.2d 257 (S.D.N.Y. 2005) .................................................................. 36, 38

*Emmons Industries, Inc. v. Liberty Mut. Fire Ins. Co.*,
545 F.Supp. 185 (S.D.N.Y. 1982) ........................................................................... 13

*Fisons Corp. v. Lumbermen's Mut. Cas. Co.*,
645 N.Y.S.2d 230 (4th Dep't 1966) ......................................................................... 12

*Hallock v. State of New York*,
64 N.Y.2d 224 (1984) .............................................................................................. 11

*Hanover Ins. Co. c. Vt. Mut. Ins. Co.*,
69 F. Supp. 3d 302 (N.D.N.Y. 2014) ....................................................................... 20

*Hassett v. Goetzmann*,
217 B.R. 9 (N.D.N.Y 1998) ..................................................................................... 33

*HBE Leasing Corp. v. Frank*,
48 F.3d 623 (2d. Cir. 1995) ............................................................................... 32, 37

*Hulse v. A.B. Dick Co.*,
162 Misc.2d 263 (N.Y. Sup. Ct. N.Y. County, July 29, 1994) ................................ 11

*In re Manshul Constr. Corp.*,
2000 U.S. Dist. LEXIS 12576 (S.D.N.Y. Aug. 29, 2000) ....................................... 37

*In re Sharp Int'l Corp.*,
403 F.3d 43 (2d Cir 2005) ....................................................................................... 37

*Karan Knitwear, Inc. v. National Ben Franklin Ins. Co.*,
12 Misc.2d 93 (1st Dep't. 1958) .............................................................................. 12

*Kreitzer v. Chamikles*,
107 Misc. 2d 398 (N.Y. Sup. Ct. N.Y. County 1980) .............................................. 29

*Le Cafe Creme, Ltd. v. Le Roux* (*In re Le Cafe Creme, Ltd.*),
    244 B.R. 221 (Bankr. S.D.N.Y. 2000) ................................................................. 37

*Lighton v. Madison-Ononadaga Mut. Fire. Ins.*,
    106 A.D.2d 892 (4th Dep't. 1984) ................................................................. 26

*Marine Midland Bank v Zurich Ins. Co.*,
    263 A.D.2d 382 (1st Dep't 1999) ................................................................. 36

*Markevics v. Liberty Mutual Ins. Co.*,
    97 N.Y.2d 646 (N.Y. 2001) ................................................................. 28

*Maryland Cas. Co. v. W.R. Grace & Co.*,
    1996 U.S. Dist. LEXIS 2963 (S.D.N.Y. 1996) ................................................................. 13

*Matter of Midland Ins. Co.*,
    269 A.D.2d 50 (1st Dep't. 2000) ................................................................. 19, 20

*Matter of Uni-Rty Corp. v. New York Guangdong Fin., Inc.*,
    117 A.D.3d 427 (1st Dep't 2014) ................................................................. 36

*Matthews v. CTI Container Transport International, Inc.*,
    689 F.Supp. 348 (S.D.N.Y. 1998) ................................................................. 29

*Meltzer v. Klein*,
    285 N.Y.S.2d 920 (N.Y. App. Div. 2d Dep't 1967) ................................................................. 36

*Mt. McKinley Ins. Co. v. Corning Inc.*,
    2012 N.Y. Misc. LEXIS 6531 (Sup. Ct. 2012) ................................................................. 22

*Munzer v. St. Paul Fire & Marine Ins. Co.*,
    145 A.D.2d 193 (3rd Dep't 1989) ................................................................. 14

*Network Enters., Inc. v. APBA Offshore Prods., Inc.*,
    202 U.S. Dist. LEXIS 17256 (S.D.N.Y. 2002) ................................................................. 30

*Nomet Mgt. Corp. v. Virginia Surety Co., Inc.*,
    2012 N.Y. Misc. LEXIS 6656 (Sup. Ct. 2012). ................................................................. 25

*Olin Corp. v. Certain Underwriters at Lloyd's*,
   468 F.3d 120 (2d Cir. 2006) ............................................................... 24

*Olin Corp. v. Insurance Co. of N.A.,*
   221 F.3d 307 (2d Cir 2000) .................................................................. 23

*Pfeffer v. Harleysville Group, Inc.*, No. 10-CV-1619,
   2011 U.S. Dist. LEXIS 146473, 2011 WL 6132693 (E.D.N.Y. 2011) .................................... 28

*Rodriguez v. Bubnis,*
   2014 U.S. Dist. LEXIS 160872 (N.D.N.Y 2014) ............................................. 1

*Roman Catholic Diocese of Brooklyn v. Nat.Union Fire Ins. Co.,*
   21 N.Y.3d 139 (2013) ........................................................... 22, 23

*Rushing v. Commercial Casualty Ins. Co.,*
   251 N.Y. 302 (1929) ........................................................... 11, 12

*Sales v. United States Underwriters Ins. Co.,*
   1995 U.S. Dist. LEXIS 4159 (S.D.N.Y. 1995) ...................................... 13

*Serio v. Public Service Mutual Insurance Co.,*
   304 A.D.2d 167 (N.Y. App. 2003) ............................................... 22

*Sharp Int'l Corp. v. State St. Bank & Trust Co.,*
   403 F.3d 43 (2d. Cir. 2005) .................................................... 33, 38

*Shelly v. Doe,*
   671 N.Y.S.2d 803 (3d Dept. 1998) ................................................. 31

*Smith & Wesson v. Birmingham Fire Ins. Co.,*
   123 A.D.2d 135 (1st Dep't. 1987).............................................. 12

*Spadaro v. Newark Ins. Co.,*
   21 A.D.2d. 226 (4th Dep't. 1964).............................................. 13

*Sperling v. Great American Ins. Co.,*
   7 N.Y.2d. 442 (1960) ........................................................ 13

*Stonewall Ins. Co. v. Asbestos Claims Management Corp.*,
73 F.3d 1178 (2d. Cir. 1995) ........................................................................ 19, 20

*U.S. Underwriters Ins. Co. v. Landau*,
679 F. Supp. 2d 330 (E.D.N.Y. 2010) .................................................................. 28

*United States Fid. & Guar. Co. v. Treadwell Corp.*,
58 F.Supp 2d 77 (S.D.N.Y. 1999) ....................................................................... 23

*United States Fire Ins. Co. v. American Nat'l Fire Ins. Co.*,
2002 WL 1758336 (Pa. Com. Pl. 2002) ............................................................... 29

*Wenig v. Glens Falls Ind. Co.*,
294 N.Y. 195 (1945) .................................................................................... 13, 21

*Woodward v. Raymond James Financial*, Inc.,
732 F.Supp.2d 425 (S.D.N.Y. 2010) .................................................................... 36

*Zappone v. Home Ins. Co.*,
55 N.Y.2d 131 (1982) .................................................................................. 27, 28

**Statutes**

New York Debtor Creditor Law ("New York DCL") §270-276 ......................................... passim

New York Insurance Law §3420 ............................................................................... passim

## PRELIMINARY STATEMENT[1]

Plaintiff's Memorandum of Law ("Mem.") contains many inaccurate, unsupported and conclusory statements regarding Defendants Lamorak Insurance Company f/k/a OneBeacon America Insurance Company ("Lamorak"), Resolute Management Inc., as administrator for Lamorak, and Continental Insurance Company, individually and as successor to certain liabilities of Harbor Insurance Company ("Continental")(Lamorak and Continental collectively referred to as "The Insurers")'s respective Settlement Agreements with Hedman Resources Limited ("Hedman") and their alleged coverage obligations. Nonetheless, the uncontroverted evidence establishes the following material facts:

- Between 2005 and 2012 the Insurers disputed that Hedman was entitled to coverage under their respective insurance policies issued to Gulf & Western Industries, Inc. ("Gulf & Western (US)");

- Even if it was entitled to coverage under the Gulf & Western (US) policies, Hedman did not provide sufficient evidence that the U.S. and Canadian primary and umbrella policies issued by Travelers, as well as Hedman's own Canadian insurance coverage, were fully and properly exhausted;

- In May 2012 Lamorak commenced a declaratory judgment action in the Supreme Court for the State of New York, New York County against Hedman, Travelers, and the other Gulf & Western (US) excess insurers, seeking a judicial determination of its coverage obligations, if any;

- The Insurers individually engaged in good faith, arm's length negotiations with Hedman, via experienced coverage counsel, throughout 2012 in order to resolve their coverage disputes;

- In exchange for a full release of any potential coverage obligations that may exist, and without acknowledging that any such obligations do in fact exist, the Insurers paid lump sum payments to Hedman and resolved their disputes.

---

[1] As an initial matter, Plaintiff's Cross-Motion for Summary Judgment is improper and unsupported by admissible evidence to the extent it relies on factual assertions made in the affidavits of attorneys John N. Lipsitz and Michael A. Ponterio [Dockets No. 118, Nos. 4 and 5], counsel for Plaintiff in this matter. The Court is respectfully referred to the Motion to Strike filed simultaneously with this filing. [Docket No. 128]. Thus, Plaintiff's motion is not supported by admissible evidence and, therefore, must be denied. *See, e.g., Rodriguez v. Bubnis*, 2014 U.S. Dist. LEXIS 160872 (N.D.N.Y 2014) at *29.

Plaintiff's cross-motion fails to present a legal basis sufficient to warrant summary judgment. First, Plaintiff asks the Court for relief well beyond any potential rights afforded under New York Insurance Law §3420 ("§3420"). §3420 does not permit a judgment creditor to seek relief beyond that which is available "under the terms of the policy," as Plaintiff attempts here. §3420 also does not function to render the Insurers' Settlement Agreements with Hedman unenforceable. In fact, none of the case law cited by Plaintiff in this regard addresses the resolution of a disputed claim for coverage and its effect on subsequent claims brought by asbestos bodily injury claimants. According to Plaintiff, insurers would never be permitted to settle coverage disputes with their insureds or putative insureds without including all potential future claimants in such discussions. §3420 contains no such requirement.

The Insurers argue that Plaintiff lacks standing to assert a claim against them. Plaintiff fails to rebut this argument. Yet, even if the Court finds that Plaintiff maintains standing, Plaintiff must "stand in the shoes" of Hedman. Thus, Plaintiff bears the burden of proving that Hedman is entitled to coverage under the Gulf & Western (US) policies (a task Hedman itself was unsuccessful in completing). Plaintiff must establish conclusively that 1) Hedman is a named assured under the policies; 2) Travelers fully and properly exhausted all underlying insurance and Hedman exhausted its own line of coverage issued in Canada; 3) Mr. Mineweaser's injury-in-fact took place during the policy period; and 4) all other terms and conditions of the policies are met. Questions of fact exist relating to these issues precluding summary judgment in Plaintiff's favor.

Moreover, even if Plaintiff can overcome these obstacles to coverage (she cannot), under New York law, Plaintiff would only be entitled to collect the Insurers' pro rata share of the underlying *Mineweaser* judgment. New York law is well defined in this area. There is simply no

basis in New York law for Plaintiff's contention that she is entitled to collect the full amount of her Judgment "up to the policy limits." Plaintiff is simply incorrect.

Plaintiff's arguments with respect to her fraudulent conveyance claim are likewise without merit. First, the simple fact is that Plaintiff is not a judgment creditor <u>of the Insurers</u>. Regardless, Plaintiff fails to satisfy several necessary elements of a fraudulent conveyance claim. Specifically, Hedman was not rendered insolvent by the conveyance of the settlement funds. To the contrary, at the time the Insurers each made their settlement payments, Hedman already received a substantial amount of cash from other insurers and, moreover, received additional funds from Lamorak and Continental. Also, the *Mineweaser* Judgment was not a debt antecedent to the transfer. Both Lamorak and Continental completed their Settlement Agreements with Hedman months before the *Mineweaser* Judgment existed.

Secondly, Plaintiff presents no admissible evidence disputing the fact that the respective Settlement Agreements between Hedman and the Insurers were made in good faith for fair consideration. Plaintiff fails to set forth any evidence of actual or constructive knowledge of any fraudulent scheme with respect to the Settlement Agreements. At best, Plaintiff offers the Court what her counsel and purported expert witness "imagines" or "fathoms" what good faith means. Such speculation does not rise to fraud as a matter of law or fact. Furthermore, Plaintiff offers no evidence supporting her allegation that the Insurers' respective Settlement Agreements were not made for fair consideration. In fact, Hedman received settlement funds from the Insurers well beyond their potential respective pro rata shares of the *Mineweaser* Judgment. Moreover, the Insurers did not buy-back "Hedman's insurance assets." It is disputed that Hedman had any insurance assets available in the first place. In exchange for millions of dollars, Hedman released its rights to assert legal arguments to attempt to convince a court to grant it coverage under Gulf

& Western (US)'s policies. In reality, even Hedman now has admitted under oath that its legal arguments for coverage were weak and there is no proof it was entitled to coverage. Thus, Plaintiff's claim that the Settlement Agreements lack fair consideration is wholly unsupported.

Finally, Plaintiff argues that the Settlement Agreement between Hedman and Continental violates New York Debtor Creditor Law ("New York DCL") §273-a because it was not formally executed until several weeks after the underlying *Mineweaser* action was filed. However, New York DCL §273-a only applies to conveyances that lack fair consideration.

## COUNTERSTATEMENT OF FACTS

Lamorak and Continental incorporate by reference the Statement of Facts provided in their Memorandum of Law submitted in support of their Motion for Summary Judgment [Docket No. 92-2] as if fully set forth herein. In addition, the following material facts are submitted in opposition to Plaintiff's Cross-Motion for Summary Judgment:

Beginning in 2005, Hedman (via coverage counsel at Proskauer Rose LLP and later from Gilbert LLP) alleged that it was entitled to coverage under the Lamorak and Continental policies. Statement of Additional Material Facts ("Stmt") ¶ 4. The Insurers contested Hedman's allegations and raised numerous coverage defenses in response to same. *Id*. Indeed, the policies under which Hedman asserted they were entitled to coverage were in fact issued to Gulf & Western (US). Stmt ¶1-3. Notably, the corporate successor of Gulf & Western (US) has recently been sued in an asbestos bodily injury case in the Supreme Court of the State New York, Eerie County and has filed a motion to dismiss wherein it set forth that it has no relationship with Hedman. Stmt. ¶ 5. Likewise, further refuting Hedman's claim to coverage is the fact that Hedman had its own line of coverage during the years 1963 to 1982, at least. Stmt. ¶ 6. Indeed, Hedman itself admits that its claim for coverage was weak, at best. Stmt. ¶ 32 (e)-(g).

Further, the Insurers also questioned whether there was full and proper exhaustion of the underlying primary policies issued by Travelers. The Insurers contested exhaustion of the underlying coverage on numerous fronts, including that Travelers issued two lines of primary coverage – a domestic (U.S) line of coverage *and* a separate Canadian line of primary coverage Stmt. ¶¶ 7-8. However, Travelers only allocated alleged Hedman claims to the domestic line of coverage and only alleged that this one line of coverage was at or near exhaustion. The Insurers asserted that claims should have been allocated to the Canadian line and that the underlying coverage could not be properly exhausted because the Canadian line of coverage was not impaired. The Insurers also asserted that Travelers appeared to have improperly allocated non-asbestos related claims to earlier policy years in an effort to accelerate exhaustion of the policies under which Hedman was alleging entitlement to coverage. *Id*. Numerous other coverage defenses also existed, including whether Hedman complied with the terms and conditions of the policies. *See, e.g.,* Schwartz Dec. Exs. V, FF.

Notwithstanding the coverage defenses the Insurers raised, in 2011, the Insurers were informed that Hedman's underlying insurance was allegedly approaching exhaustion or was fully exhausted. Stmt. ¶ 10. In light of this purported exhaustion, Hedman's defense counsel suggested that the Insurers become involved with the settlement of an asbestos bodily injury claim filed by Gerald Failing in the Supreme Court of New York, Niagara County as an interim measure while the coverage issues with Hedman were being considered. Stmt. ¶ 12. The *Failing* claim was brought against a number of parties, including Hedman, and was scheduled to go to trial in November 2011, imminently after the Insurers were informed about the claim. *Id*.

The Insurers were unable to resolve their coverage dispute with Hedman before *Failing* proceeded to trial. *Id*. Thus, while it appeared that Hedman was not an insured under any of the

Insurers' policies and there were various other viable coverage defenses, Continental, along with other alleged excess insurers (with the exception of Lamorak), nevertheless agreed to settle the *Failing* claim with Lipsitz & Ponterio LLC (Plaintiff's counsel) so as to avoid a potential verdict against Hedman while their coverage determinations were ongoing. Stmt. ¶ 13. In doing so, Continental made clear to Lipsitz & Ponterio LLP that it was doing so under a full reservation of rights to dispute coverage and that it expressly did not waive any potential coverage defenses. *Id*. The settlement of *Failing* by no means was an admission by the Insurers of any coverage obligation to Hedman. In fact, at the *Failing* settlement conference before the court, which both Mr. Lipsitz and Mr. Ponterio attended, counsel for Continental stated on the record that there "will be litigation relating to Hedman's claim for coverage." *Id*. Continental did not provide defense, indemnity, or pay any settlements of any other claims against Hedman, including the *Kuehn* or *Gielow* matters. *Id*.

In the meantime, Lamorak (who did not participate in the *Failing* settlement) sent correspondence in December 2011 directly to Mr. Ponterio and Lipsitz & Ponterio LLC partially disclaiming coverage for the *Failing claim* on numerous grounds, including but not limited to that Hedman is not a named insured under the Gulf & Western (US) policies. Stmt. ¶ 15. In February 2012, Lamorak disclaimed coverage on all Hedman-related asbestos bodily injury claims on numerous grounds, including but not limited to that Hedman is not a named insured; that the underlying Travelers' policies had not been fully and properly exhausted; and that Hedman was in violation of the Assistance & Cooperation clause contained in the policies. Stmt. ¶ 11. Both Mr. Ponterio and Mr. Lipsitz were copied recipients of this correspondence. *Id*. Thereafter, Lamorak commenced coverage litigation against Hedman seeking a declaratory

judgment that Hedman was not entitled to coverage under the Gulf & Western (US) policies. Stmt. ¶ 17.

Despite the coverage disputes made abundantly clear to Hedman, Travelers and Lipsitz & Ponterio LLC, Hedman and its counsel aggressively pursued insurance coverage under the Gulf & Western (US) policies. Ultimately, Hedman approached the Insurers through the Gilbert LLP firm to engage in discussions to resolve the coverage dispute and release its legal right to assert a claim for coverage if the parties could negotiate an acceptable settlement. Stmt. ¶ 18. However, based on the Insurers' familiarity with the Gilbert firm, the Insurers were aware that even though it believed Hedman's claims were not meritorious, the parties could spend millions in coverage litigation. Indeed, Lamorak's coverage litigation against Hedman had been commenced and Hedman was aggressively threatening to commence its own declaratory judgment against Continental in the event no settlement was reached. *Id*. at ¶¶ 18-19.

The negotiations between the parties lasted throughout 2012, and concluded with the execution of Lamorak's Agreement with Hedman in August 2012 and Continental's Agreement with Hedman in December 2012. Stmt. ¶¶ 21-18. Through these Agreements, the Insurers obtained a full and final release from Hedman from any and all obligations, claims and liability of any kind, if any, in exchange for a lump sum payment to Hedman for $1,500,000 and $1,125,000, respectively. *Id*. The essential terms of the Agreements were negotiated with Hedman's coverage counsel and ultimately agreed to and accepted by Hedman to resolve the longstanding coverage disputes. *Id*.

## ARGUMENT
## I.  PLAINTIFF SEEKS RELIEF BEYOND THE SCOPE AFFORDED UNDER NEW YORK INSURANCE LAW §3420

The parties agree on the basic premise that §3420 is a limited statutory right, which only provides a judgment creditor a limited cause of action against the insurer of a tortfeasor. Indeed,

Plaintiff concedes "Under §3420(a)(2), a judgment creditor 'in an action brought to recover damages for injury sustained or loss or damage occasioned during the life of the policy' may pursue an unsatisfied judgment against the insurer 'under the terms of the policy.' " Mem. at 11. Yet, Plaintiff ignores this principle in seeking relief against the Insurers. Plaintiff ignores the fact that Hedman was never a subsidiary of Gulf & Western (US) and Gulf & Western (US) never owned stock in Hedman. Plaintiff also ignores that under New York law, even if Hedman were eligible for coverage under the Gulf & Western (US) policies, Lamorak and Continental would only be responsible for a small fraction of the *Mineweaser* Judgment, if at all, based on their pro rata share of the risk.

§3420 allows under certain conditions a judgment creditor to enforce a valid judgment against the insurer of a tortfeasor "for damages for injury sustained or loss or damage occasioned **during the life of the policy or contract**." §3420(b)(1)(emphasis added). The New York Court of Appeals has interpreted similar language in insurance contracts to limit an insurer's potential liability to that part of the accident or occurrence that took place during the policy period. *Consolidated Edison Co. v. Allstate Ins. Co.*, 98 N.Y.2d 208, 224 (2002) ("*Con Ed*"). The language in §3420 does not dictate a different result.

In short, Plaintiff simply ignores the key facts and binding law at issue in this case and asks the Court for relief well beyond what §3420 permits.

### A.  §3420(a)(1) Does Not Require The Settlement Agreements to Be Voided

Plaintiff argues that "Insurance Law §3420(a)(1) specifically prohibits insurance companies from escaping their liability to judgment creditors by an agreement which provides 'a release to the insurer from the payment of damages for injury sustained or damage occasioned during the life of and within the coverage of such policy or contract.' " Mem. at 19. As an initial

8

matter, §3420(a)(1) sets forth no such prohibition. Plaintiff entirely misquotes the provision at issue and fabricates this purported statutory prohibition.

A proper review of §3420(a)(1) highlights the misconception in Plaintiff's argument. Plaintiff's argument is unsupported by the language of the statute on its face. §3420(a)(1) states:

> No policy or contract insuring against liability for injury to person… shall be issued or delivered in this state, unless it contains in substance the following provisions or provisions that are equally or more favorable to the insured and to judgment creditors so far as such provisions relate to judgment creditors:

> (1)    A provision that the insolvency or bankruptcy of the person insured, or the insolvency of the insured's estate, shall not release the insurer from the payment of damages for injury sustained or loss occasioned during the life of and within the coverage of such policy or contract.  New York Insurance Law §3420(a)(1).

In essence, this provision merely sets forth a requirement that certain policies must contain a statement acknowledging that neither insolvency nor bankruptcy will relieve an insurer from its coverage obligations to the policyholder. §3420(a)(1) itself does not create any rights for Plaintiff to challenge their respective Settlement Agreements with Hedman. Tellingly, Plaintiff cites no legal support for her assertion that §3420(a)(1) creates any such rights.

Regardless, Plaintiff continues to ignore the basic facts of this matter despite the robust factual record. The Insurers did not "retroactively write all their defense and indemnity obligations out of their policies... which otherwise covered the asbestos-related claims against Hedman…" Mem. at 19. The Insurers dispute that Hedman is entitled to coverage in the first place. In other words, that Hedman is entitled to coverage under the Gulf & Western (US) policies is a legal argument alleged by Hedman – it is not a proven fact. Thus, by entering into the Settlement Agreements with the Insurers, Hedman bargained away its right to assert legal arguments against the Insurers in an attempt to prove its claim that it may be afforded coverage under the Gulf & Western (US) policies and thus avoided paying legal fees and expenses for a

declaratory judgment litigation. *See* Plitt Aff. at 10. Notably, Hedman recently admitted its position was weak and it could not sufficiently prove it was entitled to coverage under the policies at issue. Stmt. ¶ 32(e) - (g). In other words, Hedman likely got more from the Insurers than it was ever entitled to. The Insurers made a business decision to resolve their differences with Hedman by making a settlement payment to avoid facing considerable legal expenses. §3420(a)(1) has no application in such context.

**B.  §3420 Does Not Render The Settlement Agreements Unenforceable**

Plaintiff contends the Insurers' respective Settlement Agreements with Hedman are unenforceable vis-à-vis her claim as a judgment creditor because the Agreements were "entered into without the knowledge or participation of the judgment creditors." Mem. at 20. Plaintiff neglects to inform the Court that the Insurers' Settlement Agreements with Hedman were negotiated and executed months before Plaintiff obtained her judgment against Hedman. Lamorak executed its Settlement Agreement and withdrew its pending declaratory judgment action against Hedman in August 2012. Stmt. ¶¶ 22, 25. Continental completed the negotiation of its Settlement Agreement with Hedman in December 2012. Stmt. ¶ 26. The *Mineweaser* Judgment, however, was not entered until April 2014. *See* Duggan Ex. 2. Simply put, at the time of the negotiations of the Settlement Agreements, Mineweaser had no standing to engage in any discussions and was not a judgment creditor of Hedman.

If Plaintiff's theory is correct (which it is not), an insurance company engaged in a coverage dispute with a policyholder or a putative policyholder – as was the case here – could virtually never enter into a settlement agreement to resolve their disputes. Buyback agreements, however, have become popular means of resolving coverage disputes involving asbestos claims. Plitt Aff. at ¶ 5. Yet, according to Plaintiff, the parties to such an agreement would have to give notice to every individual throughout the United States (at least) that may someday develop

symptoms related to asbestos exposure decades earlier. This would undoubtedly result in insurmountable hurdles preventing insurance companies and their insureds (or putative insureds) from resolving their disputes through negotiated resolutions. It is unfathomable that the law would require such extraordinary measures to resolve complex insurance coverage disputes in light of well-settled public policy of favoring settlement agreements. *See Hulse v. A.B. Dick Co*., 162 Misc.2d 263, 267 (N.Y. Sup. Ct. N.Y. County, July 29, 1994); *Hallock v. State of New York*, 64 N.Y.2d 224, 230 (1984); *Denburg v. Parker Chapin Flattau & Klimpl,* 82 N.Y.2d 375, 383 (1993). Although not directly addressing settlement of insurance coverage disputes and §3420, these cases demonstrate New York's preference in upholding negotiated settlements.

Notably, Plaintiff's cross-motion fails to cite any case law that favors such result in the context of a disputed claim to coverage for long-tail exposure claims such as asbestos bodily injury. Each of the cases cited by Plaintiff for the proposition that §3420 renders the Settlement Agreements unenforceable involve specific and identifiable claims against an insurer where coverage is not questioned. Thus, the case law relied on by Plaintiff is inapplicable to the facts here.

In *Rushing v. Commercial Casualty Ins. Co*., 251 N.Y. 302 (1929), the New York Court of Appeals addressed a claim under a homeowners' policy whereby the claimant was injured falling down the stairs in a house belonging to the assured. *Id*. at 304. The assured and the insurance company disputed whether notice was timely under the policy and arrived at a settlement to resolve their dispute which included providing the assured a defense under the policy in a litigation commenced by the injured claimant that was already pending. *Id*. Unlike here, in *Rushing* the insurer did not dispute the assured's rights to coverage (Lamorak and Continental dispute Hedman's rights to coverage); entered into a compromise specific to the

injured claimant's claim (Lamorak and Continental's Settlement Agreements resolved their coverage disputes with Hedman and not the *Mineweaser* claim specifically); and the underlying claim was pending prior to the compromise (Lamorak settled its dispute with Hedman prior to the filing of the underlying *Mineweaser* action). Thus, the holding *Rushing* is not applicable to the facts here.

Likewise, in *Karen Knitwear, Inc. v. National Ben Franklin Ins. Co.*, 12 Misc.2d 93 (1st Dep't. 1958) the settlement at issue was made after the underlying litigation was filed and where the insurer did not dispute its coverage obligations. *Karan Knitwear* addresses a single loss scenario where the claimant sought recovery for damage to its product in the hands of a common carrier during the shipping process. *Id.* In that case, the court explicitly stated that the insurance company "virtually admits that an enforceable claim under the policy existed..." *Id.* at 94. This significant fact is hotly disputed in the instant case and no such admission has ever been made by the Insurers here.

The same distinction holds true for each case cited by Plaintiff in this regard. Plaintiff does not cite a single case where a court permitted a judgment creditor to enforce a judgment under §3420 involving long-tail exposure claims where, as here, entitlement to coverage was disputed and/or the settlement occurred prior to the claimant's filing of her tort action. *See Smith & Wesson v. Birmingham Fire Ins. Co.*, 123 A.D.2d 135 (1st Dep't. 1987)(involving settlement of claim for goods damaged in shipping after claimant's loss was filed with insurance company); *Arida v. Essex Ins. Co.*, 299 A.D.2d 902 (4th Dep't. 2002)(insurance company withdrew from defense of underlying action after settlement of declaratory judgment action with its assured that was commenced subsequent to the pendency of the underlying tort claim); *Fisons Corp. v. Lumbermen's Mut. Cas. Co.*, 645 N.Y.S.2d 230 (4th Dep't 1966)(involving payment by insurance

company made in settlement of a specific shipping loss claim); *Sales v. United States Underwriters Ins. Co.*, 1995 U.S. Dist. LEXIS 4159 (S.D.N.Y. April 3, 1995)(involving personal injury caused to the underlying claimant after falling off a ladder and settlement with insurer for injury specific claim occurred after commencement of underlying tort litigation). Not one case cited by Plaintiff addresses the scenario presented here – where settlements were paid to resolve a complex coverage dispute well before Mineweaser gained status as a judgment creditor.

## II.    PLAINTIFF FAILS TO ESTABLISH HEDMAN'S RIGHTS TO COVERAGE AS A MATTER OF LAW AND FACT

Plaintiff concedes she "stands in the shoes" of Hedman with respect to her §3420 claim against the Insurers. Mem. at 16; *See also Wenig v. Glens Falls Ind. Co.,* 294 N.Y. 195, 198 (1945); *Sperling v. Great American Ins. Co.*, 7 N.Y.2d. 442 (1960); *Spadaro v. Newark Ins. Co*., 21 A.D.2d. 226, 230 (4th Dep't. 1964). It is the Insurers' position that Plaintiff's claim is barred in light of the Settlement Agreements. But even if that were not the case, Plaintiff concedes that her rights under §3420 are limited by the terms of the policies. Mem. at 16.

Yet, Plaintiff argues she does not bear the burden to prove Hedman was entitled to coverage under the Gulf & Western (US) policies. Mem. at 16-17. Plaintiff incorrectly argues that by setting aside the Insurers' Settlement Agreements, she is entitled to "full coverage up to the policy limits" as a matter of law. Plaintiff would have the Court accept that coverage existed to Hedman based on nothing more than her own speculation and conjecture. Such is the fundamental flaw in Plaintiff's claim – a claim unsupported by law or fact.

New York law is well settled that it is for the insured (or alleged putative insured) to establish coverage under an insurance policy. *Con. Ed.,* 98 N.Y.2d at 218 (2002); *Maryland Cas. Co. v. W.R. Grace & Co.*, 1996 U.S. Dist. LEXIS 2963, *21 (S.D.N.Y. March 12, 1996); *Emmons Industries, Inc. v. Liberty Mut. Fire Ins. Co.*, 545 F.Supp. 185, 188 (S.D.N.Y. 1982);

*Borg-Warner Corp. v. Insurance Co. of North America*, 174 A.D.2d 24, 31 (3rd Dep't 1992); *Munzer v. St. Paul Fire & Marine Ins. Co.*, 145 A.D.2d 193, 199 (3rd Dep't 1989). No different result is warranted here.

### A. The Coverage Dispute between Hedman and the Insurers was Longstanding and Well Known to Plaintiff's Counsel, Lipsitz & Ponterio, LLC.

The factual record clearly establishes that for several years the Insurers heavily disputed whether Hedman was entitled to coverage for a variety of reasons, including, but not limited to, whether Hedman is a named assured under the Gulf & Western (US) policies. Even assuming such status, the Insurers have openly and consistently likewise asserted that Hedman failed to show full and proper exhaustion of the underlying primary policies issued by Travelers and other insurers in the U.S. and Canada. Nonetheless, Plaintiff's counsel, John N. Lipsitz and Michael A. Ponterio, egregiously assert throughout their respective affidavits that they were unaware that Lamorak and Continental disputed coverage and that the Insurers' respective positions concerning coverage took them by "surprise." This could not be further from the truth.

In fact, Lamorak directly sent Mr. Ponterio correspondence in as early as December 2011 advising of Lamorak's partial disclaimer of coverage *vis-à-vis* Hedman followed by a disclaimer in February 2012 (approximately nine months before Plaintiff's underlying claim was even filed), concerning *all* Hedman-related asbestos claims. Schwartz Dec. Exs. V, FF. Likewise, counsel for Continental informed Lipsitz & Ponterio in December 2011 on the record before the Supreme Court of the State of New York that Hedman's rights to coverage would be subject to a declaratory judgment action. Schwartz Dec. Ex. CC.

Ultimately, instead of engaging in what would have been a rigorous and costly litigation disputing coverage in a court of law, Hedman and the Insurers reached agreements whereby Hedman released any and all rights it possibly (but unlikely) could have proven under the

policies in exchange for a settlement payment. Thus, as a practical matter the hotly disputed question of Hedman's rights to coverage under the policies, if any, has never been adjudicated. In fact, Hedman itself has recently admitted its legal and factual arguments for coverage were weak and could not be supported Stmt. ¶ 32(e) – (g). Nonetheless, Plaintiff seeks to foreclose the issue of Hedman's rights to coverage by the mere virtue of her §3420 claim. This, however, is simply contrary to §3420 and New York law. Standing in the shoes of Hedman (as she admits she must do), Plaintiff bears the burden of proof on the question of Hedman's rights to coverage. Plaintiff's arguments accordingly fail as a matter of law as significant and numerous questions of fact exist regarding any such alleged rights.

### B. Questions of Fact Exist As To Whether Hedman Is A Named Assured Under The Gulf & Western Policies

From the outset, rather than present arguments supported by admissible evidence as required by the Federal Rules, Plaintiff relies on conclusory statements that make grand and inaccurate assumptions that on their face deem Plaintiff's cross-motion for summary judgment unsustainable. Tellingly, Plaintiff does not make a single argument rooted in the actual policy language of the Insurers' policies. This pervasive and improper failure to address the insurance contracts is strikingly evident in connection with Plaintiff's unsupported assumption that Hedman is a "named assured" under the "Gulf & Western" policies. Indeed, rather than address the policy language and the evidence regarding the corporate history and structure of Gulf & Western (US), Plaintiff blurs the names of various corporate entities allegedly at issue in this matter and simply asserts that "Hedman was a subsidiary of Gulf + Western from 1967-1979" and, as such, qualifies as a named assured under "all of the policies purchased by Gulf & Western." Mem. at 14. Plaintiff's so-called argument is wrong.

*First,* Plaintiff conveniently hides from the Court that the evidence establishes that Hedman is not and has never been a subsidiary of Gulf & Western (US). Rather, the historical corporate records relied upon by Plaintiff herself at best merely establish only that an entity named "Gulf & Western (Canada), Ltd." ("G&W Canada") purchased stock in Hedman during the 1967 to 1979 time period. Stmt. ¶ 5. In that regard, the evidence further establishes that G&W Canada is a separate and distinct entity from Gulf & Western (US), the named assured under the Lamorak and Continental policies. Indeed, Lipsitz & Ponterio LLC recently filed a lawsuit for another asbestos bodily injury claim (*Chapin v. Asbestos Corp.*, et al., Eighth Judicial District County of Erie Index No. 2015-802850) in which they directly name as a defendant Gulf+Western, the alleged corporate successor of Gulf & Western (US), alleging its liability for Hedman's actions. In that action, Gulf+Western has moved to dismiss the action, in part, on grounds that it has no corporate relationship to G&W Canada and no liability for the actions of Hedman. Schwartz Dec. Ex. K. This undeniably undercuts Plaintiff's conclusory assertion that Hedman was a subsidiary of "Gulf + Western" and a named insured under the policies during the allegedly relevant time period. Indeed, even Hedman now admits that,

> "…there were gaps in the documentation creating insufficient legal certainty to establish a clear coverage obligation. Hedman was not (as best I understood and based on what sparse documentation I ever then saw) a named insured and risk[ed] that any court may not be convinced to declare a binding risk obligation (assuming Hedman could afford to retain legal counsel and prosecute such litigation)." (Schwartz Dec. Ex. RR at ¶ 48).

*Second,* the evidence in the record expressly contradicts the notion that Hedman was a covered entity under the Gulf & Western (US) insurance program. Historical records establish that Hedman purchased its own line of insurance coverage until at least 1982. Stmt. ¶ 6. Logic dictates that a small company like Hedman would not purchase and pay premiums for insurance coverage if it was insured under the Gulf & Western (US) insurance program. Likewise, there is

no indication in the 1967 stock purchase agreement between Hedman and G&W Canada that the parties intended for Hedman to be added to G&W Canada's insurance program, let alone Gulf & Western (US)'s. *Id.* Surely, the parties to such agreement would have included reference to insurance coverage as part of the consideration exchanged at that time. No such references exist. This evidence is conspicuously absent from the record presented to the Court by Plaintiff.

Thus, despite Plaintiff's unsupported statement that, "For years, these Defendants were presented with a wealth of claims data and documentation regarding Hedman's entitlement to products liability coverage under their contracts," (Mem. at 14), quite the opposite is true. Legitimate questions of fact regarding Hedman's alleged entitlement to coverage under the Gulf & Western (US) policies continue to exist and the dispute over whether Hedman is entitled to coverage under the subject policies has been known to Plaintiff's counsel for years.

Ultimately, there is simply no way Plaintiff can credibly argue that Hedman is a named assured under the policies as a matter of law warranting summary judgment. The issue is disputed and the evidentiary record establishes that, at best, there is a significant question of fact in this regard. Plaintiff is well aware that absent such proof, there is no coverage to Hedman (and no §3420 rights for Plaintiff). Plaintiff cannot and should not be permitted to avoid her burden to prove entitlement to coverage when standing in the shoes of the alleged putative assured.

### C. Questions of Fact Exist as to Whether the Policies are Triggered Under New York Law.

Plaintiff's attempt to circumvent and uproot well-established New York law by creating obligations of the Insurers where none exist is further propounded by her argument that §3420 unequivocally permits her to recover her full judgment from each of the Insurers' policies up to each year's policy limits. By doing so, Plaintiff completely ignores fundamental and basic principles of New York insurance law. This is yet another reason her cross-motion fails.

17

> ### i.    Under New York Law, Plaintiff Must Prove Injury During The Policy Period

It is undisputed that pursuant to §3420, Plaintiff must demonstrate that the judgment she seeks to enforce against the Insurers is "for damages for injury sustained or loss or damage occasioned during the life of the policy or contract." §3420(b)(1).  This is consistent with well established New York law on the issue of trigger of insurance coverage for asbestos bodily injury claims which was clearly defined by the Appellate Division, First Department in *Continental Cas. Co. v. Employers Ins. Co. at Wausau*, 60 A.D.3d 128 (1st Dep't 2008), *leave to app. denied,* 13 N.Y.3d 710 (2009) ("*Keasbey*"). Under *Keasbey,* trigger of coverage for asbestos-related bodily injury is decided based on the onset of disease or, in other words, an "injury-in-fact" test. *Keasbey,* 60 A.D. 3d at 148; *see also Continental Casualty v. Rapid-American Corp.,* 80 N.Y.2d 640 (1993). The First Department *Keasbey* test is the controlling law in New York for the asbestos bodily injury trigger. Any other assertion by Plaintiff is meritless.

In *Keasbey,* the trial court held, *inter alia,* that injury in asbestos-related claims occurs upon exposure by inhalation of fibers (as Plaintiff contends here). *Id.* at 141. The First Department, however, clearly rejected this principle and declined "to follow the suggestion that injury happens on inhalation." *Id.* at 143. Instead, the Appellate Court held that "injury-in-fact" occurs when the injury, sickness, disease or disability actually begins and requires the insured to demonstrate actual damage or injury during the policy period. *Keasbey* at 148. Notably, the New York Court of Appeals declined to take *Keasbey* for further review. 13 N.Y.3d at 710.

Therefore, in order for an insured to meet its burden under the "injury-in-fact" trigger in an asbestos bodily injury case, it is required to produce medical evidence illustrating that the point where asbestos overwhelmed the body's defenses happened during one of the relevant policy periods. *Id.* at 148; *See also Cont'l Cas. Co v. Rapid American Corp.,* 80 N.Y.2d 640, 651

18

(N.Y. 1993). Plaintiff must meet this threshold here in order to prove she is entitled to coverage under the Insurers' policies.

Plaintiff argues that *Keasbey* is not applicable because it "involved completed operations policies which are completely different from the occurrence-based policies here." Mem. at 29. However, Plaintiff fails to acknowledge that the actual crux of the *Keasbey* decision is its focus on the occurrence definition and the "during the policy period" language generally. The requirements of the non-products/operations language is merely a secondary part of the analysis employed. For example, the court in *Keasbey* stated as follows:

> [I]t is "bodily injury" that triggers coverage, and an insured in order to recover under the policy must show that an injury occurred during the policy period and that it occurred as a result of an accident or injurious exposure. *Further*, to recover under the "operations" provisions, an insured must show that the injury occurrence before any such contracting operations were completed. *Id.* (emphasis added).

The Court's trigger analysis in *Keasbey* was not impacted by the "operations" provisions. Rather, the independent and primary holding in *Keasbey* is that an asbestos claimant must produce medical evidence that the point where asbestos fibers overwhelmed the body's defenses took place during the policy period.

Remarkably, Plaintiff argues that New York law follows an exposure trigger theory relying on *American Home Products Corp. v. Liberty Mutual Ins. Co.*, 748 F.2d 760 (2d. Cir. 1984), *Stonewall Ins. Co. v. Asbestos Claims Management Corp.*, 73 F.3d 1178 (2d. Cir. 1995), and *Matter of Midland Ins. Co.*, 269 A.D.2d 50 (1ˢᵗ Dep't. 2000). Mem. at 27-28. None of these cases hold as Plaintiff argues and it should be beyond dispute that New York law uniformly applies an "injury-in-fact" trigger in asbestos bodily injury cases. Indeed, the Second Circuit in *American Home Products* clearly found that "coverage is triggered by injury-in-fact" and rejected the assured's argument that injury can be read as the equivalent of exposure. *American*

*Home Products*, 748 F.2d at 764. Likewise, the *Stonewall* court also expressly recognized that New York law follows the injury-in-fact test for determining the trigger dates of applicable insurance policies. 73 F.3d at 1194–96. Moreover, a 2000 First Department, Appellate Division decision (*Midland*) is not controlling adverse precedent to a 2008 First Department Appellate Division ruling (*Keasbey*). In fact, the First Department considered *Midland* when rendering the *Keasbey* decision and found that the trial court had improperly relied on same in rendering its decision. *Keasbey,* 60 A.D. 3d at 143–144. Specifically, the First Department held that reliance on *Midland* ignored the requirement in the Keasbey policies of injury during the policy period – the same requirement contained in the Lamorak and Continental policies. *Id.* at 144.

The exposure trigger theory propounded by Plaintiff is simply not the law in New York and has in fact been squarely rejected by New York courts. *See, e.g., Hanover Ins. Co. c. Vt. Mut. Ins. Co.*, 69 F. Supp. 3d 302, 310 (N.D.N.Y. 2014) ("In New York, an occurrence-based policy provides coverage based upon the occurrence of an injury-in-fact during the policy period… The event triggering coverage is not exposure to the source of the injury, but a bodily injury that is the result of that exposure.") Thus, Plaintiff's position is contrary to controlling New York law and should be rejected by this Court.

### ii. Questions of Fact Exist as to Whether Plaintiff Can Establish Injury In Fact During A Policy Period

Notwithstanding clear New York law, Plaintiff's Complaint fails to even allege any injury-in-fact during the Lamorak or Continental policy periods. *See* Lamorak and Continental's opening Memorandum of Law at 11-13 (Docket No. 92-2). Plaintiff's motion should be denied on this basis alone. Moreover, the factual record before the Court fails to establish an injury-in-fact during any of the relevant policy periods. In sum, Plaintiff argues that Mineweaser was exposed to asbestos during the period of 1968 until 1979. Mem. at 6. Plaintiff offers no evidence

as to when Mineweaser's injury-in-fact took place. There is simply no basis in the record to establish whether injury-in-fact took place in 1968, at the time of first alleged exposure, or some later year as is required under New York law. *Keasbey*, 60 A.D.3d at 147.

Recognizing this fatal deficiency in her claim, Plaintiff resorts to citing inapplicable case law to support her argument that injury-in-fact occurs "during the time when an individual is injuriously exposed to their toxic asbestos product fibers." Mem. at 26. In support of this position (which is contrary to New York insurance law), Plaintiff inaccurately cites *Consorti v. Owens-Corning Fiber Glass Corp*., 86 N.Y.2d 449 (1995). In *Consorti*, the New York Court of Appeals was asked to determine whether a loss of consortium cause of action exists for the spouse of a person who was exposed to asbestos fibers if the resulting illness did not manifest until subsequent to the marriage. *Id*. at 451. The Court of Appeals ruled in the negative finding that, based on principles of statute of limitations, the plaintiff's spouse was "injured" prior to their marriage. *Id*. at 453. However, the *Consorti* court does not address the injury-in-fact trigger test in the context of insurance coverage and how to determine when insurance policies are activated to respond to an asbestos-related illness. The case is simply inapplicable with respect to the insurance coverage trigger issue here.

### D.  §3420  Has No Bearing on the Pro Rata, Time on the Risk Allocation

Furthering the impropriety of her argument that she is entitled to coverage under the Lamorak and Continental policies, Plaintiff asserts that §3420(b)(1)  mandates that she is entitled to "full coverage" under the policies issued by the Insurers to Gulf & Western (US). In reality, §3420 is a procedural mechanism whereby an injured claimant can seek to enforce her rights against the insurance policy of a tortfeasor in limited and specific circumstances. *Wenig v. Glens Falls Ind. Co.,* 294 N.Y. 195, 198 (1945). §3420 is not, as Plaintiff would have it, a vehicle by

which a judgment creditor can re-write longstanding New York insurance law to obtain access to insurance policies to which they otherwise have no rights.

Assuming Plaintiff can establish injury-in-fact during the Lamorak or Continental policy periods (she cannot), under New York law, the Insurers' whose policies are triggered, if any, are only liable for their pro rata allocable share of the resulting liability. In other words, once injury-in-fact is established, the *Mineweaser* judgment must be allocated pro-rata by time over all applicable policy years. Plaintiff wholly ignores New York's pro rata allocation law in arguing that the Insurers' are liable for "full coverage up to their policy limits."

In cases involving long-tail injury (such as asbestos bodily injury claims), New York law employs a pro rata allocation where a single injury implicates multiple policy years and does not allow the policyholder to collapse many years of injury into one policy period. *Con Ed.,* 98 N.Y.2d at 224. *Con Ed* and its progeny apply the pro rata allocation because of policy language, such as here, that unambiguously covers only injuries happening during the policy period. *Con Ed*. Here, the Lamorak and Continental policies require personal injury during the policy period. See Schwartz Dec. Exs. C, D, E. In *Con Ed*, the "all sums" or "joint and several" allocation argument propounded by Plaintiffs was explicitly rejected in favor of *pro rata* allocation where the policies required injury during the policy period. There, the Court of Appeals noted that "fundamentally" the policies provide indemnification for liability as a result of an occurrence during the policy period and not outside the policy period. *Id.* at 224; *See also Mt. McKinley Ins. Co. v. Corning Inc.*, 2012 N.Y. Misc. LEXIS 6531, *21-26 (Sup. Ct. 2012); *Roman Catholic Diocese of Brooklyn v. National Union Fire Ins. Co.*, 21 N.Y.3d 139, 154  (2013); *Serio v. Public Service Mutual Insurance Co.*, 304 A.D.2d 167 (N.Y. App. 2003).

Egregiously ignoring New York law on pro rata allocation, Plaintiff appears to argue that she is entitled to collect her full judgment from one policy year of her choosing. Mem. at 29-30. Plaintiff incorrectly argues that, "…Plaintiffs are entitled to the full relief afforded under Insurance law §3420 against each Defendant, i.e., an Order of Judgment for the entire amount owed payable from the policy limits of <u>any</u> single policy year.")(Emphasis in original). Mem. at 9. In turn, Plaintiff essentially asks the Court to apply an "all sums" allocation method to her Judgment. However, such an "all sums" allocation method has explicitly been rejected by New York courts and courts applying New York law. *See Con Ed*, 774 N.E.2d at 694 (rejecting the *Keene* "all sums" joint and several allocation in favor of pro rata time-on-the-risk allocation)*; Olin Corp. v. Insurance Co. of N.A.,* 221 F.3d 307, 322-327 (2d Cir 2000)*; Roman Catholic Diocese of Brooklyn v. National Union Fire Ins. Co.*, 21 N.Y.3d 139, 154 (2013); *United States Fid. & Guar. Co. v. Treadwell Corp.*, 58 F.Supp 2d 77 (S.D.N.Y. 1999). Indeed, courts in New York have expressly rejected the Plaintiff's apparent argument that the "all sums" language in the insuring agreement of a liability policy mandates "all sums" allocation. Mem. at 29. *See, e.g.,* Con Ed., 98 N.Y.2d 208.

New York law is clear under both §3420 and otherwise that, assuming Plaintiff can establish injury-in-fact during the Lamorak or Continental policy periods (which she cannot), the Insurers whose policies are triggered, if any, are only liable for their pro rata allocable share of the resulting liability. In other words, once injury-in-fact is established, the *Mineweaser* judgment must be allocated pro-rata by time over all applicable policy years. Plaintiff wholly ignores New York's pro rata allocation law in arguing that the Insurers' are liable for "full coverage up to their policy limits." Their motion in this regard accordingly fails on its face.

> **i.    Lamorak and Continental's Respective Pro Rata Shares Of The Mineweaser Judgment Is Well Below $3 Million**

Setting aside the Insurers' position that Hedman is not entitled to coverage under the Gulf & Western (US) policies as well as the fact the Plaintiff has failed to plead and/or establish by competent medical evidence that injury-in-fact occurred during their policy periods, an analysis of the Insurers' respective pro rata shares of the *Mineweaser* Judgment serves to highlight the flaw in Plaintiff's arguments.

Plaintiff alleges Mineweaser was first exposed to asbestos in 1968. Mem. at 25. Thus, for purpose of this explanation only, the Insurers assume that (1) 1968, as alleged by Plaintiff, is the period in which the allocation period begins; and (2) Plaintiff has demonstrated that all primary coverage has been exhausted. Mineweaser died from mesothelioma in April 2014. Duggan Ex. 4. Thus, for purposes of this explanation only, the end date for the pro rata allocation spread is 2014. *Olin Corp. v. Certain Underwriters at Lloyd's*, 468 F.3d 120, 130-31 (2d Cir. 2006)(ruling that pro rata allocation period ends at the point in time when the injurious process ceases). Thus, the Insurers apply a 47 year allocation period to the *Mineweaser* Judgment. Accordingly, if coverage was available for the *Mineweaser* Judgment, under New York law each policy year across the spread period would be responsible for $63,830 of the Judgment ($3,000,000/47). The first layer excess policies issued by Lamorak cover five policy years during the above spread period (1968–1973). Stmt. ¶ 1. Therefore, Lamorak could only be responsible for $319,149 of the *Mineweaser* Judgment ($63,830*5). Likewise, Continental only issued one first layer excess policy during the applicable spread period (1976–1977, which assumes 90% of a co-insured policy period) and, as such, could only be responsible for $57,447 of the *Mineweaser* Judgment

($63,830*90%).[2] Stmt. ¶ 2. Of course, should the limits of any underlying policies prove to be intact, neither of the excess Insurers would have any coverage obligation at all. Thus, even were Plaintiff to overcome the all hurdles to establish coverage, Plaintiff would not be entitled to collect "full coverage up to the policy limits" under §3420. Plaintiff is simply incorrect in this regard.[3]

### E.  Additional Coverage Defenses Exist Precluding Coverage To Hedman

In addition to the foregoing, numerous and substantial coverage defenses exist that bar recovery to Plaintiff and, at minimum, render Plaintiff's motion for summary judgment premature and improper. Plaintiff's motion fails to even mention, let alone address, these known defenses.

*First*, Plaintiff must establish compliance with the "assistance and cooperation" clause contained in the Lamorak and Continental policies. It is Lamorak's and Continental's position that Plaintiff cannot do so and that therefore coverage is available. For example, Lamorak disclaimed coverage to Hedman in 2011 and 2012 based on failure to comply with this provision. *See* Exs. V, FF, GG, OO; Green Dec. ¶ 15. Indeed, this correspondence was directed to Plaintiff's counsel and expressly set forth, among other things, the following: "Moreover, Hedman's refusal to defend this claim is a breach of the assistance and cooperation clauses of the policies. As such, in addition to the above referenced release, no coverage is available under any OneBeacon…policy due to Hedman's breach of its duties under the assistance and cooperation clauses." *Id*. Indisputably (and at best) standing in the shoes of Hedman under §3420, no

---

[2] Under this analysis, given the amount of the *Mineweaser* Judgment and the limits of the first layer excess policies, the *Mineweaser* Judgment could not possibly implicate any additional excess layer policies issued by Lamorak and/or Continental, if any, and are therefore not included in this analysis. The amounts necessary to implicate higher excess layer polices would be astounding.
[3] In addition, to the extent any shares of the pro rata allocation spread falls on first layer excess insurers who are insolvent, Plaintiff (standing in the shoes of the purported policyholder) is responsible to assume the risk for such shares. *Nomet Mgt. Corp. v. Virginia Surety Co., Inc.*, 2012 N.Y. Misc. LEXIS 6656, *10 (Sup. Ct. 2012).

coverage is available to Plaintiff under the Lamorak and Continental policies based on this breach. *See Keasbey*, 16 Misc. 3d 223, 237 (Sup. Ct. NY County, May 8, 2007).

*Second,* Plaintiff must establish complete and proper exhaustion of the Travelers, and all other, primary policies. This is a longstanding coverage dispute that Plaintiff's counsel are well aware of. It is well documented that the Insurers historically disputed that Travelers fully and properly exhausted all of its coverage, both U.S. and Canadian, in providing defense and indemnity to Hedman. Stmt. ¶¶ 7-11. Indeed, Lamorak included in its 2012 declaratory judgment complaint a cause of action against Travelers in this regard. Schwartz Dec. Ex. S at ¶ 59–70. Continental also raised such objection in connection with its settlement negotiations with Hedman. Schwartz Dec. Ex. T. In fact, Hedman itself represented that it intended to commence litigation against Travelers in this regard Stmt. ¶ 9. Plaintiff is not entitled to coverage under any excess policies unless complete and proper underlying exhaustion is established. In fact, the documentary evidence establishes the contrary. For example, the loss runs provided to the Insurers by Travelers demonstrate that Travelers allocated significant payments for non-Hedman and/or non-asbestos claims in calculating its exhaustion. Schwartz Dec. Exs. M, V. No satisfactory explanation for this discrepancy (and others) was ever provided to the Insurers.

*Third*, Plaintiff must establish that Hedman, as an alleged assured, disclosed to the Insurers all information that is material to the risk. *Lighton v. Madison-Ononadaga Mut. Fire. Ins.*, 106 A.D.2d 892 (4th Dep't. 1984)(voiding an insurance policy where the insured fails to disclose information material to the risk). According to the allegations in Plaintiff's Complaint, Hedman had actual knowledge of the alleged health hazards associated with its asbestos product sold to the Durez plant as early as 1969. Complaint at ¶ 15. Taking these allegations as true, the Insurers have sufficient ground to void their respective insurance policies (to the extent they

covered Hedman) if such information was not provided to them during the underwriting process. No evidence in this regard has been put forth. In addition, the Insurers' policies at issue do not cover injuries caused by Hedman's intentional conduct. Schwartz Dec. Exs. C-E. Plaintiff alleges that Hedman ignored warning from health officials from 1969 to 1975 relating to potential illness from exposure to its product and failed to put proper warnings on its product. Complaint at ¶¶ 17-23. Taking these allegations as true, no coverage would be available to Hedman.

Furthermore, in order to be entitled to coverage, Plaintiff must demonstrate that Hedman has complied with all additional terms and conditions of the policies, including but not limited to the notice, ultimate net loss and other insurance clauses. Plaintiff has likewise not addressed any such provisions. Thus, summary judgment is premature and unwarranted.

### F.  The Insurers Are Not Estopped From Raising Coverage Defenses

Plaintiff implies that (1) the Insurers failed to timely disclaim coverage for the *Mineweaser* claims; and (2) coverage for Hedman must exist under the excess policies because Travelers provided defense and indemnity to Hedman under its primary policies. Plaintiff is wrong as a matter of law on both accounts.[4] As an initial matter, an insurer has no obligation to provide a timely disclaimer where the policy was cancelled or terminated prior to the filing of the underlying tort action. *Zappone v. Home Ins. Co.*, 55 N.Y.2d 131, 137-138 (1982).  Lamorak's Settlement Agreement was executed in August 2012, months before the underlying *Mineweaser* litigation was commenced.

---

[4] Plaintiff also implies that the Insurers are estopped from disputing coverage because they settled the *Failing* matter on behalf of Hedman prior to executing their settlements with Hedman. Mem. at 13. This too is incorrect as a matter of law and fact. First, Lamorak did not participate in the settlement of the *Failing* matter and never made any payment on behalf of Hedman or otherwise in connection with that case. Stmt. ¶ 15. Second, Continental's involvement in *Failing* was strictly limited to settlement-related activity and was conducted pursuant to a clear and full reservation of rights with full disclosure to Lipsitz & Ponterio that the Insurers were in the process of resolving their coverage dispute with Hedman. Stmt. ¶ 13. Regardless, Fed.R.Civ.P. 408 explicitly provides that settlement communications are inadmissible to prove the validity of a claim. Plaintiff cannot and should not rely on the settlement of *Failing* in support of its incorrect assumption that the Gulf & Western (US) policies provide coverage to Hedman.

Secondly, both Lamorak and Continental had long disputed that Hedman was entitled to coverage under their respective policies. Indeed, in at least December 2011 and February 2012 Lamorak disclaimed coverage to Hedman and then filed a declaratory judgment action in this regard. Schwartz Dec. Exs. V, S, FF, GG. Continental likewise informed Plaintiff's counsel in December 2011 that it intended to commence litigation to resolve Hedman's claim for coverage. Schwartz Dec. Ex. CC. Specifically, with respect to the *Mineweaser* claim, both Lamorak and Continental promptly disclaimed coverage in light of their respective settlements with Hedman. Stmt. ¶ 30. Also, Plaintiff's counsel was well aware of these disputes. Stmt. ¶ 31.

Equitable estoppel "applies when an insurer 'unreasonably delays in disclaiming coverage,' as 'judged from the time that the insurer is aware of sufficient facts to issue a disclaimer.'" *U.S. Underwriters Ins. Co. v. Landau*, 679 F. Supp. 2d 330, 342 (E.D.N.Y. 2010) However, "[i]f an insurer expressly reserves its rights in communications with the insured, such 'reservations preclude arguments both as to waiver and as to equitable estoppel.'" *Pfeffer v. Harleysville Group, Inc.*, No. 10-CV-1619, 2011 U.S. Dist. LEXIS 146473, 2011 WL 6132693, at *9 (E.D.N.Y. Sept. 30, 2011). Further, under New York law, estoppel only applies where the insurer relies on policy exclusions and does not apply when the claim falls outside of the coverage obligations. *Zappone*, 55 N.Y.2d at 135-136; *Markevics v. Liberty Mutual Ins. Co.*, 97 N.Y.2d 646, 648-649 (N.Y. 2001). In this case, despite the long history of correspondence setting forth their position disputing coverage to Hedman (much of which was sent to Lipsitz & Ponterio), the Insurers do not have any obligation to timely disclaim given that no coverage exists for Hedman.

Likewise, Travelers' decision to defend and indemnify Hedman under the primary policies it issued to Gulf & Western is unavailing to Plaintiff's claims against the excess insurers.

A coverage determination by a primary insurer is not binding on an excess insurer. *Conseco, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 2002 WL 31961447 (Ind. Cir. 2002); *Dresser Indus., Inc. v. Underwriters at Lloyd's, London*, 106 S.W.3d 767 (Tex. App. 2003); *United States Fire Ins. Co. v. American Nat'l Fire Ins. Co.*, 2002 WL 1758336 (Pa. Com. Pl. 2002). Both Lamorak and Continental dispute that Hedman is entitled to coverage under their policies. That Travelers improperly (or even properly) concluded that its policies provided coverage to Hedman has no bearing on this matter.[5]

## III.    PLAINTIFF'S FRAUDULENT CONVEYANCE CAUSE OF ACTION FAILS AS A MATTER OF LAW AND FACT

### A.    Plaintiff Fails To Rebut The Argument That She Has No Standing To Assert A Fraudulent Conveyance Cause Of Action

In her cross-motion, Plaintiff fails to acknowledge the precedent cited by the Insurers. The simple fact is that Plaintiff is not a judgment creditor of the Insurers, and thus, has no standing to bring a fraudulent conveyance claim against the Insurers.

New York courts have held that insurers are not deemed to be judgment debtors primarily liable to underlying plaintiffs, including for purposes of a direct action claim under §3420. *See, e.g., Matthews v. CTI Container Transport International, Inc*., 689 F.Supp. 348 (S.D.N.Y. 1998); *Kreitzer v. Chamikles*, 107 Misc. 2d 398. 399 (N.Y. Sup. Ct. N.Y. County, December 19, 1980). Plaintiff fails entirely to address this precedent.

### B.    Plaintiff Cannot Satisfy Essential Elements of Fraudulent Conveyance Claim

Plaintiff further fails to address the well-settled law cited by the Insurers in their opening brief. "To prevail on a fraudulent conveyance claim under New York law, a plaintiff must show

---

[5] Likewise, Plaintiff seems to imply that internal emails from Seaton and representations regarding its coverage defenses are binding on Lamorak and Continental. This is also incorrect. The Lamorak and Continental policies are subject only to their own terms and conditions and coverage under each of the Defendants' policies are subject to their own analyses. Plaintiff's attempt to broadly assert that the coverage determination under each of the Defendants' policies is the same is improper.

(1) the status of plaintiff as creditor of transferors; (2) the existence of a debt antecedent to the transfer; (3) a conveyance; (4) that the conveyance was made at a time of insolvency on the part of the transferors; (5) the absence of fair consideration; and (6) the intent to defraud. *Network Enters., Inc. v. APBA Offshore Prods., Inc.*, 202 U.S. Dist. LEXIS 17256 (S.D.N.Y. September 10, 2002). New York D.C.L. §§270-276 provide similar statutory requirements. Plaintiff's fraudulent conveyance claim fails to satisfy these essential elements.

### i. Hedman Was Not Rendered Insolvent By Virtue Of The Settlement Agreements

Plaintiff presents no evidentiary proof that Hedman was rendered insolvent by virtue of its Settlement Agreements with the Insurers. To the contrary, Hedman obtained nearly $6.5 million from the Insurers in exchange for a release of Hedman's (admittedly) weak and ill-advised pursuit to obtain coverage under the Gulf & Western (US) policies. Thus, there were no insurance assets "secreted away to avoid payment to asbestos-claimants" as Plaintiff contends. Rather, Hedman and the Insurers agreed to forgo expensive and complex declaratory judgment litigation after extensive arm's length, good faith negotiations. *See* Green Dec. ¶ 31; Gianakas Dec. ¶ 8; Plitt Aff. ¶¶ 10-11. As a result, Hedman's net assets actually increased by virtue of the Settlement Agreements.

In fact, by the time Lamorak executed its Settlement Agreement, Hedman was already in possession of the $3.75 million it received through its settlement with Seaton. Duggan Ex. 79. By the time Continental completed its Settlement Agreement, Hedman was already in receipt of approximately $5.4 million from the other Insurers combined. Duggan Ex. 79, Ex. 88, Ex. 98. Thus, the suggestion that Lamorak and Continental crafted secret deals with an insolvent policyholder is completely untrue.

Furthermore, Hedman has very clearly stated in affidavits to the Supreme Court of the State of New York that it has set aside funds in accordance with the indemnity provisions in certain of the settlement agreements, including its agreement with Continental, and Hedman has deposited the remainder of its funds with its secured creditor for use in Hedman's interest in accordance with its contractual obligations and pursuant to Ontario law. Schwartz Dec. Ex. RR at ¶ 108–109. Indeed, as Hedman's representative explains, in 2011 and 2012 the company "had a market value as a public company…" based on "unrealized assets of potentially great assets." Stmt. ¶ 32(h). Notably, Hedman has never declared bankruptcy and continues to incur legal fees to contest the underlying *Mineweaser* Judgment before the state courts. *See, e.g.,* Schwartz Dec. Ex. UU. Thus, it cannot be said that Hedman was rendered insolvent by virtue of its Settlement Agreements with the Insurers.

### ii.  The *Mineweaser* Judgment Was Not A Debt Antecedent To The Transfers

It is undisputed that the alleged conveyances at issue here took place in August 2012 and November 2012, respectively. Mineweaser did not obtain her judgment against Hedman until April 2014. Duggan Ex. 3. Thus, it cannot be argued that the Insurers' conveyances with Hedman, which took place several months prior to Mineweaser obtaining status as a judgment creditor, were made to avoid a debt antecedent. The *Mineweaser* debt simply did not exist at that time. Under New York law potential future tort judgments are not considered existing debts sufficient to challenge a conveyance as fraudulent. *See Shelly v. Doe*, 671 N.Y.S.2d 803 (3d Dept. 1998)(future foreseeable tort judgment is not an "existing debt" under NYDCL 271).

### iii.  The Settlement Agreements Were Entered In Good Faith

Plaintiff fails to establish that the Insurers' respective Settlement Agreements with Hedman lack good faith. In fact, there is no evidence in the record suggesting anything other

than good faith, arm's length negotiations between sophisticated parties to resolve a complex coverage dispute. *See* Green Dec. ¶ 31; Gianakas Dec. ¶ 8; Plitt Aff. ¶ 11.

Plaintiff's only basis for asserting that the Settlement Agreements were not executed in good faith is that she, as a subsequent judgment creditor, is now unable to enforce her judgment against Hedman. This, however, does not rise to the level of "bad faith." Plaintiff sets forth no evidence that the Insurers had actual or constructive knowledge of any "scheme" by Hedman nor does Plaintiff identify any legal obligation for the Insurers to prevent Hedman from using their settlement funds from paying its other (and prior) creditors. As a result, Plaintiff's claim that the Settlement Agreements lack good faith is wholly unsupported and contrary to the facts in evidence.

Where "a transferee has given equivalent value in exchange from the debtor's property… the statutory requirement of 'good faith' is satisfied if the transferee acted without either actual or constructive knowledge of any fraudulent scheme." *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 636 *2d. Cir. 1995). Plaintiff does not dispute this sound legal principle. Nonetheless, Plaintiff in her Complaint fails to allege any actual or constructive knowledge of a fraudulent scheme by Hedman. Moreover, Plaintiff likewise fails to set forth evidence of any actual or constructive knowledge on the part of the Insurers of any such purported scheme sufficient to raise a question of fact. There is simply no basis to support her claim.

Plaintiff instead relies largely on allegations that Hedman used a portion of the settlement funds obtained from the Insurers to pay off a preexisting debt to a secured creditor without the knowledge of the Insurers. According to Hedman, it used some of the settlement funds obtained from the Insurers to repay a $1 million (Canadian) loan it obtained in 2006 from a secured creditor. Schwartz Dec. Ex. RR at ¶ 110. Also, Hedman apparently paid a portion of the

settlement funds it obtained from the Insurers to its coverage counsel who represented Hedman during its negotiations with the Insurers on a contingency fee basis. *Id*. at ¶ 110. Plaintiff suggests that the Insurers knew or should have known these facts and prevented Hedman from using the settlement funds for any purpose other than paying future asbestos claimants. But Plaintiff's argument is incorrect as a matter of law.

Preferential payment by a debtor of its debts, even if known by the transferee, is not a fraudulent conveyance. *Sharp Int'l Corp. v. State St. Bank & Trust Co.*, 403 F.3d 43, 52 (2d. Cir. 2005) ("[E]ven the preferential repayment of pre-existing debts to some creditors does not constitute a fraudulent conveyance, whether or not it prejudices other creditors, because '[t]he basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy some of his creditors; it normally does not try to choose among them.") While there is certainly no evidence that the Insurers had knowledge that Hedman would use their settlement funds to repay its secured debt (and in fact the Insurers did not know, *see, e.g.*, Green Dec. ¶ 23)), even if Plaintiff could put forth such evidence, no fraudulent conveyance could exist as a matter of law.

Likewise, Plaintiff sets forth no basis in law requiring the Insurers to direct Hedman's use of the settlement funds in any way. Indeed, New York courts have found that the creation of trust accounts has no bearing on the question of fraudulent conveyance. *See, e.g., Bucki v. Singleton (In re Cardon Realty Corp.)*, 146 B.R. 72, 77-78 (Bankr. Ct. W.D.N.Y. 1992) (defendant's trust theory could not shield transfers from being deemed fraudulent); *Hassett v. Goetzmann*, 217 B.R. 9, 20 (N.D.N.Y 1998) (same).

Furthermore, the factual record demonstrates that certain of the settlement funds, specifically those funds paid to Hedman by Continental, presently remains intact (although

apparently in the possession of Hedman's secured creditor for its use in Hedman's interests). Schwartz Dec. Ex. RR at ¶ 110. Hedman has stated that it set aside the settlement funds paid by Continental ($1.125 million US) in light of certain indemnity provisions in the Settlement Agreement between Hedman and Continental. *Id*. at ¶ 110. Clearly, Hedman and the Insurers did not conspire to "secret away" assets to prevent Plaintiff from enforcing her judgment. Hedman and the Insurers settled a complex coverage dispute in good faith and Hedman purportedly used the funds it received in accordance with its obligations to a secured creditor under Ontario law. Hedman has informed Plaintiff that if she wishes to try and realize on her Judgment in accordance with Ontario law she may take steps to do so and deal with Hedman's secured creditor in due course. *Id*. at ¶ 115. While these undisputed facts are clearly set forth in the record, there is no evidence to support Plaintiff's "fraudulent scheme" hypothesis.

### iv. The Settlement Agreements Were Made For Fair Consideration

As an initial matter, it should not be lost on the Court that the Insurers' (and apparently Hedman) continue to maintain that Hedman is not entitled to coverage under the Gulf & Western policies at all. The uncontroverted facts establish that Lamorak and Continental disputed that Hedman was entitled to coverage under the policies for several reasons, including but not limited to Hedman is not a named assured under the policies and Hedman failed to demonstrate full and proper exhaustion of the underlying Travelers policies. Indeed, Hedman has now revealed that it understood its coverage position to be "extremely weak" and admits it could not establish that it was entitled to coverage under the Gulf & Western policies. Stmt. ¶ 32 (e)–(g). Essentially, Hedman's bluff and empty threats resulted in combined payments of approximately $6.5 million. In this context, it could hardly be said that the Settlement Agreements were without fair consideration.

Plaintiff argues that the consideration paid to Hedman in resolution of the declaratory judgment action commenced by Lamorak (and the declaratory judgment action Hedman threatened to commence against Continental) was "grossly inadequate" because "none of the Defendants' funds have been used to pay the judgment in this case..." Mem. at 5. This argument is a red herring. In reality, the monies paid to Hedman were more than adequate to cover Lamorak's and Continental's pro rata proportional share of the *Mineweaser* judgment under New York law. The Insurers paid Hedman $1.5 million and $1.125 million, respectively, to settle their coverage disputes. Such amounts far exceed any liabilities that the Insurers could face under §3420 if obligated to satisfy the *Mineweaser* Judgment (*See* discussion at Sec. II.D.i above).

Indeed, the evidence establishes that the Settlement Agreements were made after hard fought negotiations between sophisticated entities and counsel based on a realistic projection of the available coverage and Hedman's potential future liabilities. Stmt. ¶ 20. For example, Continental explained to Hedman as follows:

As a result, the amount of money that Hedman would need to spend on defense and indemnity in order to reach, significantly impact, and ultimately exhaust the remaining limits, if any, of these policies is astounding. We have looked at a number of scenarios and applied New York's allocation principles in spreading the loss. The result of some of the most conservative scenarios from Continental's point of view (the scenarios with the highest amounts of money crammed into the fewest policy years) are summarized in the chart I sent you earlier this week.

These principles, along with the simple fact that Travelers still owes coverage (i.e., defense and indemnity) under the Canadian policies are among those that Continental will assert in the event that it is a party to litigation. Continental is very confident with respect to its positions.

That said, Continental would like to, if possible, avoid unnecessary litigation costs. Thus, Continental has authorized an offer of $950,000." (Schwartz Dec. Ex. T.)

Setting aside Continental's coverage defenses, Continental and Hedman ultimately arrived at a settlement of $1.125 million to avoid a prolonged court battle. Stmt. ¶ 26. In other words, as

demonstrated in the above email, for example, the Insurers and Hedman did not conspire to "cut and run" to avoid making payments to future judgment creditors. The Insurers had (and still have) real and viable coverage defenses and made an informed, calculated decision to avoid litigation based on their projections of Hedman's liabilities and the potential exposure under the policies were a court to ultimately uphold Hedman's assertion to rights to coverage. Any argument to the contrary is refuted by the factual record.

### C.  Plaintiffs Failed To Plead A Cause Of Action Under NYDCL §276

Plaintiff argues that the evidence suggests that "badges of fraud" exist and that the Settlement Agreements between Hedman and the Insurers violate New York D.C.L. §276. Mem. at 33. However, Plaintiff did not plead allegations of actual or intentional fraud under New York D.C.L. § 276 in her Complaint and any such a claim is therefore not before this Court. *See Meltzer v. Klein*, 285 N.Y.S.2d 920, 921-922 (N.Y. App. Div. 2d Dep't 1967); *Woodward v. Raymond James Financial*, Inc., 732 F.Supp.2d 425, 427 433 (S.D.N.Y. 2010).

Here, Plaintiff's Complaint does not allege actual fraud, nor does it allege any evidence of actual fraud that would even come close to meeting the heightened particularity requirements for such a claim. *See Eclaire Advisor Ltd. v. Daiwoo Eng'g & Constr. Co.*, 375 F.Supp.2d 257, 268-269 (S.D.N.Y. 2005)("A party seeking to set aside a fraudulent conveyance under §276 must plead an actual intent to defraud with particularity sufficient to meet the heightened standard of Fed.R.Civ.P. 9(b)"); *Matter of Uni-Rty Corp. v. New York Guangdong Fin*., Inc., 117 A.D.3d 427, 428 (1st Dep't 2014); *Marine Midland Bank v Zurich Ins. Co.*, 263 A.D.2d 382 (1st Dep't 1999).

Nonetheless and notwithstanding Plaintiff's failure to assert a cause of action under New York D.C.L. §376, Plaintiff cannot establish actual, intentional fraud as a matter of law. New York D.C.L. § 276 provides that  "[e]very conveyance made and every obligation incurred with

actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." As a threshold matter, the intent contemplated under this statute is that of Hedman, the judgment debtor– not the insurers. *See e.g., In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005) (*citing HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1059 n. 5 (2d Cir. 1995)) (stating that to prove actual fraud under Section 276, a creditor must show intent to defraud on the part of the transferor); *Le Cafe Creme, Ltd. v. Le Roux* (*In re Le Cafe Creme, Ltd.*), 244 B.R. 221, 239 (Bankr. S.D.N.Y. 2000) (same); *In re Manshul Constr. Corp.*, 2000 U.S. Dist. LEXIS 12576 (S.D.N.Y. Aug. 29, 2000) (same). The simple fact is that the Insurers are not judgment debtors. Thus, as Plaintiff does not assert her fraudulent conveyance claim against Hedman in this action, any attempted assertion of "actual fraud" must fail on its face.

Furthermore, Plaintiff fails to establish any "badges of fraud" sufficient to demonstrate an actual fraudulent scheme with respect to the Settlement Agreements with Hedman. Plaintiff ignores the fact that Hedman's rights to coverage was disputed and Hedman was admittedly "taking its best shot" at making legal arguments to assert rights to coverage. Stmt. ¶ 32(e)-(g); Plitt Aff. at ¶ 11. The Insurers' settlement payments to Hedman were not made to absolve themselves of any contractual obligations to Hedman, but rather, in resolution of a coverage dispute that would have required an expensive declaratory judgment litigation. Also, Plaintiff has not established that Hedman is insolvent or is unable to satisfy the judgment against it. To the contrary, Hedman has informed Plaintiff as to the whereabouts of the settlement funds and has invited Plaintiff to deal with Hedman's secure creditor in accordance with Ontario law. Schwartz Dec. Ex. RR at ¶ 115. Plaintiff refuses to do so. This does not amount to "badges of fraud."

In defining "badges of fraud" in the fraudulent conveyance context, courts typically look for "a close relationship between the parties to the alleged fraudulent transaction (Hedman and the Insurers were adverse); a questionable transfer not in the usual course of business (buyback agreements in disputed coverage cases are popular in the insurance industry; *See* Plitt Aff. at ¶ 5); inadequacy of consideration (not present here)… and retention of control of the property by the transferor after the conveyance (not present here)." *Sharp Int'l*, 403 F.3d at 56. New York courts also consider whether the transferor was rendered insolvent by the conveyance (Hedman's assets increased by $6.5 million in exchange for a release of its pursuit of legal arguments to attempt to prove coverage under the Gulf & Western (US) policies); suspicious timing of the transactions (the Settlement Agreements were made months before Mineweaser obtained her judgment); and the use of fictitious parties (not present here). *Eclaire*, 375 F.Supp.2d at 269. There is no basis for Plaintiff's contention that badges of fraud exist here.

Moreover, Plaintiff offers no evidence of any actual intent to defraud by Hedman. To the contrary, Hedman recently stated in a sworn affidavit submitted to the Supreme Court of the State of New York, Erie County, in the underlying *Mineweaser* action that, "…Hedman did not undertake these settlement agreement negotiations with the intention of avoiding or defeating any future asbestos related judgments, that Hedman did not misuse or misapply the proceeds of these settlement agreements to avoid or defeat paying future asbestos related judgments…" Schwartz Dec. Ex. SS at ¶ 4. Despite Plaintiff's rhetoric, there is no evidence to the contrary.

Nor does the factual record before this Court establish any actual fraud between Hedman and the Insurers. Lamorak and Continental respectively provided Hedman with assets sufficient to satisfy their respective proportionate shares of the *Mineweaser* judgment – and then some. This alone is inherently contradictory to any assertion of actual fraud and moots Plaintiff's

allegations of actual fraud or financial injury. Furthermore, by the time Lamorak and Continental each made their respective settlement payments to Hedman, Hedman was already in receipt of sufficient funds to pay its prior debts. Indeed, in February 2012 Seaton made its settlement payment to Hedman of $3.75 million. Duggan Ex. 79. By the time Continental completed its buyback agreement with Hedman, Hedman was already in receipt of approximately $5.4 million from the other Insurers. Thus, the notion that Hedman was "insolvent" at the time Lamorak and Continental executed their respective settlements with Hedman is contrary to the factual record. Indeed, the Continental Settlement Agreement includes a "Warranty of Solvency" provision expressly representing that Hedman was solvent at the time of the transfer. Stmt. ¶ 14.

The only conclusion that can be made from the factual record is that the Insurers engaged in good faith settlement negotiations to resolve a disputed claim to coverage by an entity not named in the Gulf & Western (US) policies in order to resolve their disputes and avoid costly litigation. The Insurers paid significant sums of money to Hedman in resolution of their disputes, which was sufficient for Hedman to pay the *Mineweaser* judgment. Plaintiff offers no facts that dispute this conclusion.

### D. Plaintiff Is Not Entitled To Summary Judgment Against Continental Pursuant To New York Debtor Creditor Law §273-a

Plaintiff's cross-motion contains an inherent contradiction that is fatal to her argument for summary judgment under New York D.C.L. §273-a. Plaintiff argues that Continental violated N.Y. D.C.L. §273-a because its Settlement Agreement with Hedman was executed subsequent to the filing of the underlying *Mineweaser* litigation (Mem. at 34-35). However, Plaintiff wholly ignores the language and requirements of New York D.C.L. §273-a.

Section 273-a of the New York D.C.L. on its face provides that, "Every conveyance **made without fair consideration** when the person making it is a defendant in an action for

money damages… is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment." New York D.C.L. § 273-a (emphasis added). A transfer is fraudulent under this section as to creditors only if made without fair consideration. *Id.; A.F.L. Falck, S.p.A. v. E.A. Karay Co.*, 722 F. Supp. 12, 17 (S.D.N.Y. 1989). Therefore, in order to succeed on her motion for summary judgment under §273-a, Plaintiff must demonstrate that there is no material issue of fact whether the conveyance was made without fair consideration. *See Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1272-73 (S.D.N.Y. 1991).

In her motion, however, Plaintiff explicitly argues that, "Whether or not a purchaser gave 'fair consideration' is a question of fact." Mem. at 32. Thus, Plaintiff concedes that she is not entitled to summary judgment as a matter of law pursuant to New York D.C.L. §273-a. Regardless, as discussed above, Plaintiff cannot establish that fair consideration was lacking as the Insurers provided Hedman with sufficient cash to satisfy their respective pro rata shares of the *Mineweaser* judgment.

Further, Plaintiff misrepresents to the Court the holding in *Berner Trucking Inc. v. Brown*, 281 A.D.2d 924 (1st Dep't 2001) (Mem. at 35). In *Berner*, the court granted summary judgment on a New York D.C.L. §273-a claim because the transfer at issue was made between an officer of a corporation to another entity in which the same person was a shareholder. *Id*. at 925. The court found that such transfers are not made in good faith as a matter of law. *Id*. However, no such transfer took place here. The Insurers and Hedman are not aligned entities or alter egos of each other. In fact, the transfers resulting from the Settlement Agreements were made precisely to resolve disputes between adverse parties. Nothing in *Berner* supports Plaintiff's assertion that summary judgment is warranted here.

## CONCLUSION

For all the above reasons, Lamorak and Continental respectfully request that the Court grant their motion for Summary Judgment pursuant to Fed.R.Civ.P. 56 and dismiss Plaintiff's Complaint in its entirety, deny Plaintiff's Cross-Motion for Summary Judgment in its entirety, and for such other and further relief as to the Court seems proper.

Respectfully submitted,

**/s/ Joseph J. Schwartz**
Eileen T. McCabe
Jaimie H. Ginzberg
Joseph J. Schwartz
**MENDES & MOUNT, LLP**
750 Seventh Avenue
New York, NY 10019
(212) 261-8000

*Attorneys for Defendants, Lamorak Insurance Company f/k/a OneBeacon America Insurance Company, Resolute Management Inc. as administrator for Lamorak, and The Continental Insurance Company, Individually and as Successor of Certain Liabilities to Harbor Insurance Company*

Dated: New York, New York
        December 1, 2015